Opinion for the Court filed by Circuit Judge BROWN.
Opinion dissenting in part and concurring in part filed by Circuit Judge WILKINS.
BROWN, Circuit Judge:
“[Ljike a bad penny, it return[s] to [us] again.” Letter from Abigail Adams to Mary Smith (Oct. 6, 1766) (referencing unattributed aphorism). We revisit the Congress Park Crew (“Crew”), “a loose-knit gang that ran a market for crack cocaine in the Congress Park neighborhood of Southeast Washington, D.C., for nearly thirteen years.” United States v. Jones, 744 F.3d 1362, 1365 (D.C.Cir.2014). Previously, we affirmed the sentences imposed on three of six jointly-tried Crew members; two additional members now appeal: one challenging his conviction and both challenging their sentences. We affirm the district court.
I
In 2005, eighteen Congress Park Crew members were indicted on various crimes including conspiracy and crack distribution. Eleven members pleaded guilty and one member was tried separately in 2006; the remaining six Crew members were *92 tried together in 2007. In Jones we found the district court did not err in its sentencing of three of the jointly-tried Crew Members — Joseph Jones, Desmond Thurston, and Antwuan Ball. Id. at 1367-70. The present consolidated appeal concerns two additional Crew members tried in 2007— David Wilson and Gregory Bell (collectively “Defendants”). Wilson was convicted of two counts of aiding and abetting first-degree murder, seven counts of distributing crack cocaine, and one count of using a communications facility in relation to a narcotics offense. Bell was convicted of three counts of distributing crack cocaine. The Defendants were acquitted of a mé-lange of other charges including all narcotics and racketeering conspiracy charges and, in Wilson’s case, a third count of aiding and abetting murder.
Wilson challenges his conviction at trial. He claims ineffective assistance of counsel based on substitutions of his defense attorneys, that two uncharged murders were improperly admitted into evidence, and that the Government failed timely to produce pieces of exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Both Defendants also challenge the sentences imposed on them for crack cocaine distribution. We address each issue in turn.
II
Wilson’s most facially credible argument is that substitutions of trial counsel deprived him of effective representation. But we are ultimately unpersuaded by his theory on appeal, which hinges on an extension of the doctrine of presumptive prejudice.
A
The course of Wilson’s representation was marked by a number of substitutions of his lead and secondary court-appointed counsels.[1] We summarize the substitutions most pertinent to the present appeal. In January 2007 — approximately two months prior to trial — Jenifer Wicks assumed the role of lead counsel, after previously assisting as secondary counsel for several years. On February 5, 2007, Gary Proctor was appointed to assist Wicks, and trial began on February 13, 2007. Approximately four months into trial, and shortly before the close of the Government’s case, Wicks was hospitalized then subsequently released with medical instructions to refrain from stressful work. In Wicks’s prolonged absence Proctor filed a motion for mistrial or severance. Proctor asserted he was, in his view, unable to adequately represent Wilson because, inter alia, he had limited federal trial experience [2] and had missed significant portions of the Government’s case at trial, amounting to approximately one third of the Government’s case by Proctor’s unverified but uncontested estimation.
The district court initially granted severance but the Government sought reconsideration, proposing a “brief continuance[,] ... a week or two, to allow Mr. Proctor to get up to speed,” before allowing the Government “to finish its five to six days or so of its case,” then a longer continuance (“a month and a half’), to provide Proctor time to prepare Wilson’s case in defense. *93 J.A. 3383-84. Finding the Government’s proposal “eminently fair,” J.A. 3386, the district court reversed its earlier grant of severance. Secondary counsel[3] was appointed to assist Proctor in his new role as lead counsel, and trial resumed in general accordance with the Government’s proposal.
Proctor represented Wilson as lead counsel through the remainder of trial arguments. Although the dissent assumes Wicks’s departure from the case robbed the defense of the benefits of her prior work, Proctor’s ability (or inability) to directly consult with Wicks, in preparing and conducting Wilson’s defense at trial, is sparsely developed in the record before us. But see J.A. 3417 (indicating Wicks had at least some capacity to accept telephone calls, albeit without providing insight into the extent of her availability or to what extent Proctor or Davies employed Wicks as a resource), 3486 (Proctor noting he “dragged Ms. Wicks out of retirement one more time,” to be present in the courtroom during his closing arguments).[4]
B
Despite being acquitted on a number of serious offenses — including counts of aiding and abetting murder, assault with intent to murder, and RICO and narcotics conspiracy — Wilson asserts Proctor’s representation fell below the minimum threshold of professional competence required by the Sixth Amendment. See generally Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Rather than identifying deficiencies in Proctor’s actual representation and then arguing prejudice under Strickland’s two-part test, see id. at 687-88, 104 S.Ct. 2052, Wilson argues Proctor’s representation was presumptively unreliable.
In United States v. Cronic the Supreme Court identified three “circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.” 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). See also Woods v. Donald, — U.S. —, 135 S.Ct. 1372, 1378, 191 L.Ed.2d 464 (2015) (reiterating that Cronic applies only in such circumstances). “Most obvious, of course, is the complete denial of counsel.” Cronic, 466 U.S. at 659, 104 S.Ct. 2039. The Court also recognized the presumption in the constructive absence of counsel, “if counsel entirely fails to subject the prosecution’s case to meaningful adversarial testing,” or where “[cjircumstances ... [are] present ... [such that] although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial.” Id. at 659-60, 104 S.Ct. 2039.
*94 Courts have limited Cronic to “a very narrow range of situations.” United States v. Hughes, 514 F.3d 15, 18 (D.C.Cir.2008); United States v. Thompson, 27 F.3d 671, 676 (D.C.Cir.1994). For example, Cronic is only applicable for failure to test a prosecutor’s case where “the attorney’s failure ... [is] complete,” Hughes, 514 F.3d at 18; the presumption is “reserved for situations in which counsel has entirely failed to function as the client’s advocate.” Florida v. Nixon, 543 U.S. 175, 189, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004). Compare Burdine v. Johnson, 262 F.3d 336, 349 (5th Cir.2001) (unconscious attorney presumptively prejudicial, if unconscious during a critical stage of a proceeding), with Bell v. Cone, 535 U.S. 685, 696, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (no presumptive prejudice where counsel “failed to mount some case for life after the prosecution introduced evidence in the sentencing hearing and gave a closing statement”) (internal quotation marks omitted); Cronic, 466 U.S. at 649-50, 104 S.Ct. 2039 (presumption inapplicable where a young attorney represented a defendant in a complex mail fraud case, where the attorney specialized in real estate law, it was his first jury trial, and he had twenty-five days to prepare versus the Government’s four and one-half years); Bellamy v. Cogdell, 974 F.2d 302, 303-04 (2d Cir.1992) (no per se prejudice where 71 year-old defense attorney suffered from a variety of physical ailments that left him “virtually incapacitated” and “at times” unable to concentrate, even where those inca-pacifies led to the suspension of the attorney’s license shortly after the defendant’s conviction at trial).
Wilson would have us extend Cronic to cases where a substitution means at least one specific defense counsel was not continuously present during each and every critical stage of trial.[5] In Wilson’s view, in cases where counsel is substituted, the duration of the continuance granted to allow substitute counsel to prepare is irrelevant. See Reply Brief for Appellant David Wilson at 7, United States v. Bell, No. 08-3037 (June 30, 2014) (“Wilson’s complaint is not that Proctor [] needed more time to prepare after Wicks became ill; Wilson’s argument is that an effective defense was impossible without Wicks.”). Because the issues are not factually developed on the record before us, Wilson’s theory of presumptive prejudice cannot hinge on the substitute counsel’s inability to consult with his predecessor or on prior counsel leaving no substantial trial notes or memoranda to assist in the defense.[6]
The dissent focuses on concerns Wilson never raised — either at trial or on appeal: (1) that the mid-trial substitution led to the irretrievable loss of Wick’s strategic consultations with him and (2) that Proctor could not begin his representation with the same well-developed rapport. But, since the Sixth Amendment does not guarantee representation by a single counsel or a meaningful relationship with counsel, Morris v. Slappy, 461 U.S. 1, 19-19-20, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983), *95 the fact that Proctor could not replicate the exact depth of relationship Wilson enjoyed with Wicks—even if true—cannot be the basis of a presumption of prejudice.
Further, the record is inconclusive as to whether Proctor had access to a paralegal who was present for the entire trial and could foster continuity for the defense team after the mid-trial substitution. See J.A. 3381 (the Government arguing that Proctor was “not truly alone,” in part, because “Ms. Wicks ha[d] a paralegal who’s been very involved in the case, [and who] certainly must know the files”). Wilson does not point to anything in the record to adequately and concretely demonstrate that Proctor’s lead counsel representation began from a completely blank slate. We decline to presume such facts from an underdeveloped record, particularly where—as here—no other party would have been better situated than Wilson to inform the court of any limitations.
Wilson analogizes Proctor to an errant defense counsel whose absence prevents him from “assess[ing] each piece of the government’s case[,] observing] how it is received by the jury[,] assessing] how it fits into the larger picture of trial[,] and ... choos[ing] what evidence to present in the defense[’s] case.” Id. at 9. To be sure the complete absence of any dedicated counsel for the accused, during a critical stage of a proceeding, would warrant Cronic’s presumption. See, e.g., United States v. Russell, 205 F.3d 768, 771-72 (5th Cir.2000); United States v. Decoster, 624 F.2d 196, 256 (D.C.Cir.1976) (en banc) (“[WJhere the defendant had no counsel at all at a critical stage of his trial, automatic reversal of his conviction is usually in order.”). But where counsel is substituted promptly, there is no impermissible gap in a defendant’s representation. The identity of counsel has changed but at each critical stage a defense lawyer was present to actively subject the prosecution’s case to “the crucible of meaningful adversarial testing.” Cronic, 466 U.S. at 656, 104 S.Ct. 2039. See Goodwin v. Johnson, 132 F.3d 162, 176 (5th Cir.1997) (‘When the defendant receives at least some meaningful assistance, he must prove prejudice in order to obtain relief for ineffective assistance of counsel.”) (emphasis added). Cf. Carroll v. Renico, 475 F.3d 708, 713 (6th Cir.2007) (finding the Supreme Court has not even clearly established whether a co-defendant’s counsel standing in for a defendant’s absent lawyer is presumptively prejudicial).[7]
The inquiry thus turns on whether substitution of counsel, during the course of trial, is tantamount to a constructive absence of representation or is otherwise a circumstance where no “lawyer, even a fully competent one, could provide effective assistance.” Id. at 659-60, 104 S.Ct. 2039. “The question is not whether counsel in those circumstances will perform less well than he otherwise would, but whether the circumstances are likely to result in such poor performance that an inquiry into its effects would not be worth the time.” Wright v. Van Patten, 552 U.S. 120, 125, 128 S.Ct. 743, 169 L.Ed.2d 583 (2008).
Mid-trial substitution may prove disruptive. Even following a continuance, a substitute defense counsel will sometimes be disadvantaged by his absence from earlier proceedings. Indeed, best practice may favor allowing for a sever- *96 anee or mistrial where the prolonged illness or absence of a defense counsel would require substitution. But “best practice” is not the standard for constitutional deficiency. Nor does every disadvantage to the defense’s representation, however meagre, suffice to “infect[ ] [an] entire trial with error of constitutional dimensions.” United States v. Frady, 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). See generally Harrington v. Richter, 562 U.S. 86, 110, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) (the Sixth Amendment “does not guarantee perfect representation, only a ‘reasonably competent attorney’ ”).
Imaginative theorizing added to rampant conjecture augmented by inapposite examples does not a convincing case for Cronic’s categorical rule make. Prudence counsels only greater caution when called on to find constitutional inadequacy as a per se matter, particularly where the state of the record requires speculation as to deficiencies that may or may not have existed. In this case, even the particular days Proctor missed prior to the substitution is not beyond contention. See generally Government’s Brief at 25 & n. 10, United States v. Bell, No. 08-3037 (June 30, 2014) (noting that Proctor’s estimate that he missed one-third of the trial was neither expressly endorsed by the court nor confirmed below).
If any break in the continuity of counsel at trial were sufficient to create a presumption of prejudice, even where a different attorney for the accused was present at critical stages missed by the substitute lead counsel, the Sixth Amendment’s guarantee would resemble less the assurance of “effective” representation and instead demand something closer to a “perfect” defense. While perfection may seem a laudable goal, this latter threshold of performance is not demanded by our Constitution. See United States v. Gonzalez-Lopez, 548 U.S. 140, 147, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006) (right to counsel guarantees “effective (not mistake-free) representation”). Cf. Jackson v. Johnson, 150 F.3d 520, 525 (5th Cir.1998) (“A constructive denial of counsel occurs ... in only a very narrow spectrum of cases where the circumstances leading to counsel’s ineffectiveness are so egregious that the defendant was in effect denied any meaningful assistance at all.”) (quoting Childress v. Johnson, 103 F.3d 1221, 1229 (5th Cir.1997)).
Wilson emphasizes that, unless the lawyer assuming the lead counsel role was continuously present at trial prior to the substitution, he will have been unable to physically “observ[e] witnesses as they testify [or] ... how the jury receive[d] the evidence” for any days missed. Brief for Appellant David Wilson at 35, United States v. Bell, No. 08-3037 (June 30, 2014). Substitute lead counsel is instead left to review the trial transcript; evaluate notes or memoranda left by substitute counsel’s predecessor; or engage in second-hand consultation with the former lead counsel, if available.[8]
Review of the trial transcript or other records is, at times, an imperfect substi *97 tute for being present. Indeed, courts often acknowledge that “a cold record can-, not recreate testimony. A witness may be credible on paper but not on the stand.” Harvard v. Florida, 459 U.S. 1128, 1134, 103 S.Ct. 764, 74 L.Ed.2d 979 (1983).[9] This does not mean, however, that it is impossible for an attorney to make sound assessments of credibility in the absence of direct observation of trial testimony. Even if it does not perfectly substitute for in-person observation, trial transcripts can provide insight into issues of reliability. Inconsistent statements; defensive, evasive, or ambiguous answers; and the nature of follow-up questions asked may all offer a window into the reliability of a witness’ comments and are frequently dis-cernable based on a substitute counsel’s review of the transcripts alone, even assuming the absence of any trial notes or other commentary from the predecessor defense counsel.
There may be cases where a defendant is constitutionally prejudiced by his substitute counsel’s inability to directly evaluate a critical witness’s demeanor at trial because, for example, prior counsel was unavailable to consult and left no material records or notes, the transcript of the witness’s testimony was highly ambiguous, and the prosecution’s case significantly hinged on the particular witness’ recitation. But constitutional prejudice does, not automatically flow in every case where counsel is substituted mid-trial.[10] See United States v. Griffiths, 750 F.3d 237, 239 (2d Cir.2014) (per curiam) (“We hold that there is no per se violation of the Sixth Amendment right to be represented by one’s counsel of choice and to effective assistance of counsel when a district court, after defense counsel has become incapacitated, appoints counsel, over, defendant’s objection, to deliver the defense summation, notwithstanding the fact that appointed counsel did not witness the presentation of the evidence.”).
.That a mid-trial substitution of counsel may potentially increase the likelihood of strategic blunders by the defense does not invalidate the prudence of inquiring whether, in a given case, mistakes of constitutional dimension were actually made. Cf. Childress, 103 F.3d at 1229 (“[W]e have consistently distinguished shoddy representation from no defense at all.... [B]ad lawyering, regardless of how bad, does not support the [per se ] presumption of prejudice under Cronic.”).[11] A challenge to the *98 mid-trial substitution of Proctor calls for “precisely the type of probing and fact-specific analysis” that Strickland is designed to require. Sears v. Upton, 561 U.S. 945, 955, 130 S.Ct. 3259, 177 L.Ed.2d 1025 (2010) (per curiam).
We decline to sweep virtually every mid-trial substitution under Cronic’s blanket rule. See generally Cronic, 466 U.S. at 659 n. 26, 104 S.Ct. 2039 (“[T]here is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt.”); Appel v. Horn, 250 F.3d 203, 214 (3d Cir.2001) (“[T]he majority of Sixth Amendment right to counsel cases are, and should be, analyzed under the ineffective assistance standard of Strickland which requires a showing of prejudice.”). The Cronic inquiry is a largely mechanical one, and we are mindful of avoiding a holding that could open the door to replacing “case-by-case litigation over prejudice with case-by-case litigation over prejudice per se.” Scarpa v. Dubois, 38 F.3d 1, 14 (1st Cir.1994) (in the context of finding Cronic inapplicable based on claims of substandard attorney performance).
Moreover, we are unpersuaded that a contrary rule would actually prove narrow. The dissent suggests Cronic would “only” apply where a “defense counsel is incapacitated mid-trial ... and no replacement attorney is available who observed the testimony of key government witnesses ... and participated in material consultations with the defendant.” Dissenting Op. at 116. The dissent’s logic would extend to most mid-trial substitutions. And this kind of excruciatingly detailed examination of the facts is exactly the circumstance for which Strickland is designed.
Ill
Wilson also challenges the admission of evidence of two uncharged murders: that Wilson — with the assistance of his drug supplier, Larry Browne — shot and killed Sam Phillips and that, in a botched robbery of another drug dealer, Wilson and two other co-conspirators killed Reginald Reid.
The lower court deemed the Phillips murder extrinsic to the charged conspiracies, noting it stemmed from a “dispute over an overlapping romantic relationship.” J.A. 2133. Nonetheless the murder was admitted under Federal Rule of Evidence 404(b) to show Wilson’s access to and familiarity with the use of firearms.
In contrast, the Reid murder was admitted as “intrinsic” to the charged conspiracy because it was “evidence ... of the development of relationships among the alleged co-conspirators to show the way that the alleged conspiracies grew and were formed and developed, as well as evidence of prior conspiratorial conduct among the alleged conspirators that would be corroborative of the' defendant’s entry into the charged agreements in the indictment.” J.A. 2132.
*99 Our review is for abuse of discretion. See United States v. Douglas, 482 F.3d 591, 596 (D.C.Cir.2007) (Rule 404(b) standard); see also id. (review of Rule 403 balancing reviewed only for grave abuse); United States v. Becton, 601 F.3d 588, 595 (D.C.Cir.2010) (applying the Rules 401 and 403 abuse of discretion standard when reviewing if evidence was intrinsic to the charged crime). We find no basis tó reverse the district court’s judgment.
A
As to the Phillips murder, the Government makes a threshold argument that Wilson waived his challenge by arguing he should be allowed to offer evidence that the Phillips shooting resulted in Phillips’s death. See Wagner v. Taylor, 836 F.2d 596, 599 (D.C.Cir.1987) (“It has long been settled that on appeal a litigant cannot avail himself of an error that he induced the court under review to commit.”). We find no applicable waiver. Wilson argued in favor of presenting evidence the Phillips shooting ended in a homicide because the district court had previously held, over Wilson’s objections, that the shooting was admissible. In light of the lower court’s ruling, Wilson favored presenting evidence the Phillips shooting ended in a homicide under the theory that evidence of a homicide would better show any bias of the Government’s witness (Browne), who had allegedly assisted Wilson in the Phillips shooting and was testifying pursuant to the conditions of a plea agreement.
Though not waived, Wilson’s merits argument is fruitless. The Phillips murder is admissible to show use of and familiarity with firearms. Knowledge of firearms is a permissible purpose under Rule 404(b). See Fed.R.Evid. 404(b)(2); United States v. Miller, 895 F.2d 1431, 1435 (D.C.Cir.1990) (the purposes listed in Rule 404(b)(2) are illustrative, not exhaustive). Prior use and familiarity with firearms is relevant to satisfying the scienter requirement to multiple charged offenses, including counts of first degree murder while armed and use of a firearm in relation to a crime of violence. Cf. United States v. Cassell, 292 F.3d 788, 794-95 (D.C.Cir.2002) (“A prior history of intentionally possessing guns ... is certainly relevant to the determination of whether a person ... on the occasion under litigation knew what he was possessing and intended to do so.”).
It was likewise not an abuse of discretion — much less grave abuse — for the lower court to hold exclusion unwarranted under Rule 403.[12] See Fed.R.Evid. 403. Beyond the Phillips murder, considerable other evidence was presented showing Wilson’s access and familiarity with firearms, including testimony that Wilson carried a gun; twice shot at James Faison, a rival gang member; and, in a separate incident, opened fire outside a recreation center. This tends to reduce the danger of unfair prejudice from evidence of the Phillips murder — as that shooting “did not *100 involve conduct any more sensational or disturbing than the [other]” conduct attributed to Wilson. United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir.1990). The relevancy of the Phillips shooting is also not rendered redundant, in light of other evidence of his familiarity with firearms; the shooting holds unique probative value because it arose during a drug transaction that “occurred relatively close in time to the conduct charged in the indictment, thereby increasing the probative value of the 404(b) evidence.” United States v. West, 22 F.3d 586, 597 (5th Cir.1994).
Moreover, the district court issued limiting instructions to mitigate the danger of undue prejudice or improper inferences. There is nothing to suggest the jury ignored the court’s instructions. See United States v. Brown, 597 F.3d 399, 406 (D.C.Cir.2010) (“The jury is presumed to have followed [a] cautionary instruction.”). Thus, “[w]here, as here, there is no compelling or unique evidence of prejudice, we deem such a limiting instruction sufficient to protect a defendant’s interest in being free from undue prejudice.... ” United States v. McCarson, 527 F.3d 170, 174 (D.C.Cir.2008).
B
The district court also admitted evidence of the Reid murder, finding it intrinsic to the charged conspiracy because it “showfed] the way that the alleged conspiracies grew and were formed and developed, as well as evidence of prior conspiratorial conduct among the alleged conspirators that would be corroborative of the defendant’s entry into the charged agreements in the indictment.” J.A. 2132.
Generally intrinsic evidence includes “aet[s] that [are] part of the charged offense” or “some uncharged acts performed contemporaneously with the charged crime ... if they facilitate the commission of the charged crime.” United States v. Bowie, 232 F.3d 923, 929 (D.C.Cir.2000). Thus, evidence is not generally rendered intrinsic simply because it completes the story or explains the circumstances behind a charged offense. Id. But even if evidence of the Reid murder was improperly admitted as intrinsic, any error was harmless.[13] “In a conspiracy prosecution, the government is [ ] allowed considerable leeway in offering ... [extrinsic, ‘other crimes’ evidence under Rule 404(b)(2) ] to inform the jury of the background of the conspiracy charged ... and to help explain to the jury how the illegal relationship between the participants in the crime developed.” United States v. Mathis, 216 F.3d 18, 26 (D.C.Cir.2000). It is well-established that such other crimes evidence is admissible to establish the “contours of [a] conspiracy.” United States v. Graham, 83 F.3d 1466, 1473 (D.C.Cir.1996).[14]
*101 IV
Wilson next asserts Brady violations, which bear on his conviction for two counts of aiding and abetting murder. The Government’s theory was that Wilson acted as the getaway driver for two gunmen in the murder of rival gang-member Ronnie Middleton and his girlfriend Sabrina Bradley. The Government argued Wilson assisted in the shootings because he believed Middleton was responsible for the murder of Maurice Doleman, who was “like a brother” to Wilson. See J.A. 2572 (“They was almost like brothers, sir.”). Wilson points to the Government’s failure to timely disclose various reports allegedly material to the murders and favorable to the accused. Our review is de novo. In re Sealed Case No. 99-3096 (Brady Obligations), 185 F.3d 887, 892 (D.C.Cir.1999).
Wilson first points to the Carter Report, which the Government disclosed roughly three months into trial. That police report contains a two-paragraph section reflecting Bradley Carter’s statement that Aman Ball and Joseph Jones committed the murders, rather than Antonio Roberson and Antoine Draine — as the Government had theorized at trial. Second, Wilson argues the Doleman Reports were also improperly suppressed. Wilson obtained the Doleman Reports only in post-trial discovery. The reports consist of summaries of police interviews conducted during the investigation of the Doleman murder, including summaries of statements by three witnesses who indicated that they believed or had heard individuals other than Middleton were responsible for Doleman’s death.
Wilson cannot show the delayed disclosure of the Carter Report was prejudicial. See generally Strickler v. Greene, 527 U.S. 268, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (the three components of a Brady claim are (1) the evidence at issue must be favorable to the accused because it is exculpatory or impeaching; (2) the evidence must have been suppressed by the State, willfully or inadvertently; and (3) prejudice must have ensued). “[WJhere disclosure was made but made late, the defendant must show a reasonable probability that an earlier disclosure would have changed the trial’s result and not just that the evidence was material.” United States v. Andrews, 532 F.3d 900, 907 (D.C.Cir.2008). As the district court noted, the Carter Report “was disclosed approximately two months before the close of the government’s case-in-chief, and Wilson had ample opportunity to use this evidence at trial.” United States v. Wilson, 720 F.Supp.2d 51, 70 (D.D.C.2010). To the extent the Government’s narrative as to the Middleton-Bradley murders was not fully challenged, it is because Wilson elected not to use the Carter Report to do so. See id. at 68 (Wilson did not recall the Government’s witnesses, Kelliebrew or Capíes, to incorporate information from the Carter Report into the defense’s cross-examination or otherwise use the report to investigate facts and question witnesses).[15] Moreover, even if the Government’s delay had prevented Wilson from using the Car *102 ter Report at trial (it did not), it is doubtful any prejudice would have ensued. The report does not even overtly contradict the Government’s theory regarding Wilson’s involvement in the Middleton-Bradley murders. Although the report implicates two different shooters, the Government believed Wilson was the driver to and from the killings, not one of the shooters.
We also find no Brady violation based on suppression of the Doleman Reports. “Suppressed information is exculpatory and thus ‘favorable’ to the defense for Brady purposes when it directly contradicts the motive theory testified to by prosecution witnesses.” Mendez v. Artuz, 303 F.3d 411, 414 (2d Cir.2002). The Government theorized Wilson believed Middleton was responsible for Doleman’s death, and this belief precipitated Wilson’s involvement in the Middleton-Bradley murders. The suppressed reports, however, merely demonstrate that other individuals believed someone other than Middleton was responsible — which is, at best, tertiary to the question of Wilson’s subjective beliefs and does not directly contradict the Government’s theory of motive. Cf. Hunt v. Lee, 291 F.3d 284, 295 (4th Cir.2002) (“[T]he state’s theory [was] that Hunt killed Jones because Hunt believed that Jones ... t[old] [the police] that Hunt killed Ransom. It is irrelevant whether Jones [] actually told the police that Hunt was Ransom’s killer. The critical issue is whether Hunt believed that Jones was telling the police that Hunt was the killer.”). Further, Wilson cannot show the suppressed evidence “could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.” Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). “The police reports do not directly exonerate Wilson or lessen the force of the corroborated and credible testimony regarding admissions Wilson made about his involvement in the[] [Middleton-Bradley] murders to [various witnesses].” Wilson, 720 F.Supp.2d at 65.[16]
Even considering the cumulative effect' of the multiple alleged Brady violations, United States v. Lloyd, 71 F.3d 408, 412 (D.C.Cir.1995), the untimely or suppressed materials are insufficient to undermine our confidence in the jury’s verdict or to overcome the Government’s evidence, which included, inter alia, testimony from multiple witnesses that Wilson told them of his involvement in the Middleton-Bradley murders.
V
We turn to the Defendants’ sentencing challenges. Both Wilson and Bell were convicted of multiple counts of crack distribution. They argue the sentences imposed by the district court violated the Sixth Amendment and were proeedurally and substantively unreasonable. As the Defendants concede, our prior decision in Jones, 744 F.3d 1362, directly forecloses these sentencing arguments — save one claim related to a two-point firearm enhancement applied to Bell. See Oral Arg. Tr. at 1:08:42-09:53 (“We understand that this panel cannot reverse the holding in Jones. *103 We think it was wrongly decided.... We would just ask that you would agree that we should have rehearing.... ”).[17]
A
In determining the Defendants’ sentences, the district court attributed 1.5 kilograms of crack cocaine from the conspiracy to each of the Defendants as relevant conduct, a finding the court made by a preponderance of the evidence. Because the jury acquitted the Defendants of the charged drug conspiracies, the Defendants argue the district court’s attributions violated the Sixth Amendment by increasing the minimum and maximum terms of imprisonment based on facts not found by a jury beyond a reasonable doubt.
The Sixth Amendment provides criminal defendants with the right' to a jury trial. “The right includes, ... as its most important element, the right to have the jury, rather than the judge, reach the requisite finding of ‘guilty.’ ” Sullivan v. Louisiana, 508 U.S. 275, 277, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). Acting in conjunction with the Sixth Amendment is the protection of the Fifth Amendment, which requires a jury “to find each element of [a] crime beyond a reasonable doubt,” Patterson v. New York, 432 U.S. 197, 204, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), before a guilty verdict can properly be rendered, United States v. Gaudin, 515 U.S. 506, 509-10, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995).
That said, many facts that result in an increase to a defendant’s sentence are not considered elements of a crime and can be found by a sentencing judge relying on a preponderance of the evidence standard. Rita v. United States, 551 U.S. 338, 352, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007) (“[A] sentencing court [may] take account of factual matters not determined by a jury [] to increase the sentence in consequence.”). The scope of this general sentencing principle is, of course, not unlimited. Facts that increase the maximum, Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), or mandatory minimum, Alleyne v. United States, — U.S. —, 133 S.Ct. 2151, 2155, 186 L.Ed.2d 314 (2013), statutory sentence are considered elements that must be found by a jury beyond a reasonable doubt. Nonetheless “long-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proved by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction” or increase the statutory mandatory minimum. United States v. Settles, 530 F.3d 920, 923 (D.C.Cir.2008).
The Defendants’ sentences fall within the statutory range, rendering their constitutional argument unconvincing. They first suggest the sentencing court ran afoul of Alleyne by using the 1.5 kilograms of crack cocaine from the conspiracy to sentence the Defendants pursuant to 21 U.S.C. § 841(b)(1)(A), which includes a higher mandatory minimum sentence than subsections (B) or (C). See 21 U.S.C. § 841(b)(1)(A)-(C) (subsection (A) provides for a ten year mandatory minimum, as opposed to five years for subsection (B) and no mandatory minimum for subsection (C)). But “there is no indication in the record that the district court judge thought he had to impose a higher manda *104 tory minimum sentence as a result of finding [the Defendants] responsible for a larger amount of cocaine.” United States v. Hernandez, 731 F.3d 666, 672 (7th Cir.2013). The filed judgments make clear the Defendants were sentenced pursuant to subsections (B) and (C). See J.A. 1812, 2113-14. See also J.A. 3664, 3702 (sentencing judge identifying the appropriate sentencing ranges, rather than the ranges that would be produced if he had sentenced the Defendants pursuant to subsection (A)). .
Even if the sentences fall within the statutory range, the Defendants argue AUeyne prohibits any increase in the defendant’s base offense level or upward departure from the base offense level, where such an increase or departure is based on facts found by a sentencing judge to a preponderance of the evidence. Alleyne, however, dealt with an increase to the statutory range — not increases to a defendant’s range under the Sentencing Guidelines (“Guidelines”). See Alleyne, 133 S.Ct. at 2161 n. 2 (“Juries must find any facts that increase [ ] the statutory maximum or minimum.... Importantly, this is distinct from factfinding used to guide judicial discretion in selecting a punishment within limits fixed by law.”) (emphasis added) (internal quotation marks and citations omitted). “We [ ] lack any basis to reconsider the settled rule that enhancing a sentence within the statutory range based on facts found by the judge, as opposed to the jury, does not violate the Sixth Amendment.” Jones, 744 F.3d at 1369. “[Judicial fact-finding does ‘not implicate the Sixth Amendment even if it yield[s] a sentence above that based on a plea or verdict alone.’ ” Id. at 1370 (quoting United States v. Bras, 483 F.3d 103, 107 (D.C.Cir.2007)).
B
The Defendants next challenge their sentences as proeedurally unreasonable. Among other things, they protest the district court’s consideration of 1.5 kilograms of crack cocaine from the acquitted conspiracy when calculating the Defendants’ sentences. They argue crack cocaine distributed through the acquitted conspiracy is not “relevant conduct” where the Defendants’ convictions were for “street-level drug dealing.” Brief for Joint Appellants Sentencing at 23, United States v. Bell, No. 08-3037 (June 30, 2014). See generally U.S.S.G. § 1B1.3(a) (relevant conduct). Yet in Jones we affirmed drug distribution sentences imposed on three of the Defendants’ co-conspirators, where the sentencing judge attributed cocaine distributed through the course of the acquitted conspiracy. 744 F.3d at 1368 (“ ‘[Relevant conduct’ includes acts that were part of the same course of conduct or common scheme or plan as the offense of conviction, and here, the district court specifically found that appellants’ crack distribution offenses were part of a ‘common scheme’ with Congress Park Crew members, a finding that we have already determined was not clearly erroneous.”) (internal quotation marks and citations omitted).[18]
Relying on Justice Scalia’s partial concurrence in Rita, 551 U.S. at 375, 127 S.Ct. 2456 (Scalia, J., concurring in part), the Defendants next rehash their Sixth Amendment argument couched as a dis *105 tinct theory of procedural unreasonableness. They argue the sentencing court misunderstood the scope of his sentencing authority and misapplied the Guidelines. The Defendants’ refrain is familiar: because the acquitted conspiracy was not found by a jury beyond a reasonable doubt, it was procedurally unreasonable for the sentencing judge to consider it in calculating the Defendants’ base offense levels under the Guidelines. According to the Defendants, the acquitted conspiracy could, at most, only be considered as a section 3553 factor. “Whatever the merits of Justice Scalia’s argument [in Rita ], it is not the law.” Jones, 744 F.3d at 1369. A sentencing court may base a sentence on acquitted conduct, “even when consideration of the acquitted conduct multiplies a defendant’s sentence severalfold,” so long as the sentence does not exceed the statutory maximum and is based on conduct established by a preponderance of the evidence. Id.
The Defendants’ final argument for procedural unreasonableness relates to a two-point firearm enhancement imposed on Bell. See U.S.S.G. § 2D1.1(b)(1). The enhancement was imposed based on a loaded handgun found hidden in Bell’s bedroom in proximity to other tools of the narcotic trade. The search leading to the firearm occurred in 1996, during the lifetime of the acquitted crack conspiracy, but Bell argues the enhancement can only be applied if a firearm was present during an offense of conviction- — i.e., if the firearm was found during one of the drug distribution counts of which he was convicted. Bell is mistaken. “The applicability of a specific offense characteristic, such as section 2Dl.l(b)(l), depends on whether the conduct at issue is ‘relevant’ to the offense of conviction,” United States v. Pellegrini, 929 F.2d 55, 56 (2d Cir.1991). “[T]he enhancement is to be applied whenever a firearm is possessed during conduct relevant to the offense of conviction,” United States v. Smith, 127 F.3d 1388, 1390 (11th Cir.1997), which “includes acts ‘that were part of the same course of conduct or common scheme or plan as the offense of conviction.’ ” Id. (quoting U.S.S.G. § 1B1.3(a)(2)). It was not erroneous for the sentencing judge to find the firearm was possessed during conduct relevant to the offenses of conviction. The weapon was found “hidden in a speaker ... in proximity to other tools of the narcotic trade,” J.A. 2627-28, and the judge found — by a preponderance — that the life of the drug conspiracy encompassed both the time of the search and the time of the offenses of conviction.
C
The Defendants also contend their sentences were substantively unreasonable, though — at times- — -their arguments are mere variations of their constitutional or procedural unreasonableness theories. For example, the Defendants again argue the sentencing judge could not attribute crack cocaine from the acquitted conspiracy to them, as relevant conduct. This particular iteration of the Defendants’ argument hinges on their belief that “[t]he only reasonable interpretation of the [jury’s acquittal on conspiracy] is that [the jury] believed either no conspiracy existed or that Appellants were not part of the conspiracy.” Brief for Joint Appellants Sentencing at 28.[19] But “an acquittal in a *106 criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof.... [A] jury’s verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence.” United States v. Watts, 519 U.S. 148, 156, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997).
The Defendants also argue it was substantively unreasonable to attribute the distribution of 1.5 kilograms of crack cocaine to them. The Defendants argue there was insufficient evidence to support the quantities of crack cocaine attributed by the judge, based on the evidence presented of the quantities that Bell and Wilson personally distributed. The sentencing judge’s attribution, however, was — in the first instance — based upon whether crack cocaine sales among all the conspirators exceeded 1.5 kilograms and were reasonably foreseeable to the Defendants. J.A. 3623-24 (Bell),[20] 3687-88 (Wilson). See also Jones, 744 F.3d at 1368 (permitting the attribution of crack cocaine from defendants’ coconspirators as relevant conduct); U.S.S.G. § 1B1.3(a)(1)(B) & cmt. 2 (conduct of coconspirators is “relevant” in determining a defendant’s Guideline range where he engages in jointly undertaken criminal activity and the coconspirators’ conduct is reasonably foreseeable to the defendant). This finding was supported by ample evidence. See, e.g., J.A. 3621-24 (as to Bell, noting — in addition to various other witness testimony — that the co-conspirators who entered guilty pleas admitted to their accountability for over 1.5 kilograms of crack cocaine); J.A. 3689-91 (same, as to Wilson).
The Defendants further protest that the Government relied upon testimonial evidence, rather than physical or documentary evidence. But there is no problem with the Government relying on admissible testimony, so long as it is sufficient — either alone or in combination with other evidence — to satisfy the requisite burden of proof. See United States v. Graham, 317 F.3d 262, 271 (D.C.Cir.2003). Moreover, contrary to the Defendants’ claims of vagueness and inconsistency, the Government’s witnesses offered specific information to support the quantities of cocaine attributed to the Defendants based on the acquitted conspiracy. Drug dealer Cedric “Conner ... [testified to] supplying an estimated quantity in excess of one kilo between 1999 and 2000, and [coconspirator Robert] Capíes ... [admitted to] buying over 500 grams from 1992 to 2001.” J.A. 3622. The Defendants challenge the credibility of these witnesses. But, while evidence of their eoeonspirators’ disreputable character “may undercut the[ir] ... credibility generally, [it] do[es] not establish that it was implausible for the district court to credit particular aspects of their testimony, especially where, as here, the cooperators offered mutually corroborative accounts.” 744 F.3d at 1367.
*107 VI
For the foregoing reasons the district court is

Affirmed.

. Secondary counsel was appointed because the Government could seek the death penalty on certain charged offenses.

. Proctor did, however, possess considerable state trial experience, including participating, by his own estimate, in “perhaps” a dozen death penalty cases in five states. He also served as a second chair in a prior federal criminal trial.

. Matthew Davies was appointed on June 28. The court recessed until July 9. The Government concluded its case on July 17. The court recessed again until August 21. See J.A. 3408, 3215.

. The dissent suggests there is no reasonable expectation that Wicks could significantly assist in the defense, based on her doctor's orders. See Dissenting Op. at 116 n. 2. Wicks's doctor's instructions make clear Wicks "need[ed] to be off work for ... 2 weeks [following her hospitalization] and [could] not return to trial work for [an] additional 6 months.” J.A. 739. But we do not find these instructions sufficient to determine Wicks's unavailability to consult with Proctor, except perhaps in the two weeks immediately after her hospitalization. See also J.A. 3399 ("A fair reading of that letter ... is that after two weeks or so time, Ms. Wicks is available in some capacity, whether it's assisting, writing direct exam outlines, preparing witnesses in her office, consulting, doing something along those lines.”).

. In this case, Proctor began his representation of Wilson prior to the commencement of trial. In this general sense, Proctor represented Wilson continuously throughout the period of trial, but the crux of Wilson’s argument centers on parts of the trial — prior to Proctor's assumption of the lead counsel role — where Wicks was present to represent Wilson but Proctor was absent.

. Although we do not know for certain, Proctor would at least potentially have had access to any notes or memoranda Wicks may have left behind, as he had access to Wicks's office and records after her hospitalization. J.A. 3379 ("I spent half of Friday and most of Saturday in [Wicks’s] office just physically trying to figure out where everything is.”).

. We do not opine on the' propriety of such an arrangement, which other circuits—though not the Supreme Court—have suggested is improper. See, e.g., Olden v. United States, 224 F.3d 561, 569 (6th Cir.2000). In the present case, despite substitutions, Wilson was always represented by attorneys dedicated to his defense.

. Although they do not specifically address mid-trial substitutions, ABA Guidelines on the performance of defense counsel in death penalty cases recommends counsel, and other members of the defense team, “maintain! ] the records of [a] case in a manner that will inform successor counsel of all significant developments relevant to the litigation,” provide successor counsel with client files and all other information relevant to the representation, "share potential further areas of legal and factual research with successor counsel,” and cooperate with successor counsel's “professionally appropriate legal strategies.” Am. Bar Assn, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, 31 Hofstra L.Rev. 913, 1074 (2003).

. This maxim is frequently employed to rationalize the greater deference appellate tribunals grant trial judges when reviewing issues of credibility. See, e.g., Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Nonetheless, there is no per se rule against mid-trial substitution of judges. See United States v. Thomas, 114 F.3d 228, 254 (D.C.Cir.1997) ("|T]he complexity of a case and the abundance of evidence typically determine the extent of the review necessary to familiarize a successor judge with the record...."). See generally Fed.R.Crim.P. 25(a).

. If we adopted Wilson's theory, a mid-trial substitution would perhaps only be permitted if the substitute counsel was present during all critical stages prior to his substitution.

.In some cases, it may prove challenging to show precisely how a substitution of counsel affected the course of performance — a factor that we have, at times, considered relevant in other contexts. E.g., United States v. Gonzalez-Lopez, 548 U.S. 140, 150, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006) (recognizing a limited right to counsel of choice, where counsel is not appointed). But the challenge of divining how substitutions affected the course of a proceeding are not different in kind from other circumstances where Strickland governs. See, e.g., Padilla v. Kentucky, 559 U.S. 356, 366, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010) (indicating Strickland governs ineffectiveness claims based on acceptance of a plea bargain). Cf. Strickland, 466 U.S. at 710, 104 S.Ct. 2052 (Marshall, J., dissenting) (criticizing this aspect of the Strickland standard). *98 Moreover, to say that a substitution of counsel affects the course of a trial is not the equivalent of saying the substitution rendered representation constitutionally ineffective. See Gonzalez-Lopez, 548 U.S. at 150-51, 126 S.Ct. 2557 ("[T]he requirement of showing prejudice in ineffectiveness claims stems from the very definition of the right at issue; it is not a matter of showing that the violation was harmless, but of showing that a violation of the right to effective representation occurred.... [I]f and when counsel's ineffectiveness 'pervades' a trial, it does so (to the extent we can detect it) through identifiable mistakes. We can assess how those mistakes affected the outcome.”). See also Strickland, 466 U.S. at 693, 104 S.Ct. 2052 (majority opinion) ("Attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial.”).

. Rule 404’s advisory committee note employs slightly different language in describing the balancing inquiry. Fed.R.Evid. 404 advisory committee's note ("The determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence -in view of the availability of other means of proof and other factors ... under Rule 403.''). Contrary to Wilson's argument, Rule 403's ordinary "substantially outweighs” standard applies in weighing prejudice for evidence admitted under Rule 404(b). See, e.g., Cassell, 292 F.3d at 795 ("Our analysis does not end after determining that prior bad acts evidence is probative to a non-character issue under Rule 404(b). We must continue with a determination of whether the district court erred in determining that the evidence is admissible under Rule 403 ... [which] prohibits the admission of relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice....”).

. We therefore need not resolve whether the Reid murder can be intrinsically admitted as prior conspiratorial conduct within the umbrella of the charged conspiracy — i.e., as an (uncharged) overt act in furtherance of the charged drug conspiracy or as contemporaneous action in facilitation of. the conspiracy— based on the Government’s theory' that it was committed to "enrich certain members of the [conspiracy], as well as weaken another drug dealer.” J.A. 656 (Government's Supplemental Notice & Motion to Admit Evidence of Other Crimes). But see United States v. Watkins, 591 F.3d 780, 785 (5th Cir.2009); United States v. Lewis, 759 F.2d 1316, 1344 (8th Cir.1985) ("[T]he government is not limited in its proof to establishing the overt acts specified in the indictment.”).

. In the context of the Reid murder, Wilson’s opening brief makes only fleeting reference to the Rule 403 standard, as part of its summary of a Third Circuit case. See Brief for Appellant David Wilson at 46. Because his Reid murder, Rule 403 argument is first *101 made in his Reply, see Reply Brief for Appellant David Wilson at 20, the argument is waived, see In re Asemani, 455 F.3d 296, 300 (D.C.Cir.2006).

. Wilson's attorney, Wicks, also did not request a continuance to further investigate the new information. She instead asked for a delay in calling Carter, which the district court granted. J.A. 2992-93. See Andrews, 532 F.3d at 907 (no Brady violation based on the government's failure to produce notes until the fourth day of trial, where the notes were only six pages in length and the defense did not request a continuance to examine or investigate them despite having two opportunities to do so).

. Wilson’s co-conspirators Bobby Capies and Kairi Kelliebrew testified that Wilson told them of his involvement in the Middleton-Bradley murders. Torran Scott, who had a daughter with Bradley, also testified that Wilson told him “he didn’t know that [Bradley] was in the truck.” J.A. 3320. Renee Cotting-ham, who unlike the other three witnesses was not testifying pursuant to a deal with the Government, testified that Wilson provided her with specific details about the crime and that she observed Wilson repeatedly mumbling to himself, "Why was she there? Why was she there? She shouldn’t have been there.” J.A. 3339.

. This Court's prior decisions "bind the circuit unless and until overturned by the court en banc or -by Higher Authority.” Critical Mass Energy Project v. Nuclear Regulatory Comm’n, 975 F.2d 871, 876 (D.C.Cir.1992)(internal quotation marks omitted).

. The Defendants also raise an argument that there was insufficient evidence to support an attribution of 1.5 kilograms of crack cocaine. The specifics of their contentions are somewhat better developed in a parallel argument they raise for substantive unreasonableness, discussed infra Part V(C). To the extent this procedural unreasonableness argument is distinct from the Defendants' substantive unreasonableness argument, it remains irreconcilable with Jones. See 744 F.3d at 1366-68.

. The Defendants assert this conclusion necessarily follows because the jury purportedly made specific factual findings as to the drug quantities attributable to Bell and Wilson as co-conspirators, by acquitting them of conspiring to distribute at least 5 kilograms of cocaine and 50 grams of crack cocaine, as well as the lesser included offenses of conspir *106 acy to distribute 500 grams of cocaine and 50 grams of crack cocaine and conspiracy to distribute detectable amounts of cocaine and crack cocaine. Yet "[a]n acquittal [is] only [] an acknowledgment that the government failed to prove an essential element of the offense beyond a reasonable doubt.” United States v. Watts, 519 U.S. 148, 156, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997). It does not amount to a specific finding that no conspiracy existed or that the Government would be unable to prove the Defendants’ participation in the conspiracy under a reduced burden of proof.

. The sentencing judge made a secondary finding that Bell was personally responsible for at least 1.5 kilograms of crack cocaine. J.A. 3623. This finding was also adequately supported. See J.A. 3622-23.