# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 11, 2016            Decided July 8, 2016

No. 13-3019

UNITED STATES OF AMERICA,
APPELLEE

v.

HENRY BRANDON WILLIAMS,
APPELLANT

———

Consolidated with 13-3035, 14-3012

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:11-cr-00129-11)
(No. 1:11-cr-00129-2)
(No. 1:11-cr-00129-1)

———

*Stephen C. Leckar*, *Edward C. Sussman*, and *Julian S. Greenspun*, all appointed by the court, argued the causes and filed the joint briefs for appellants.

*Nicholas P. Coleman*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Elizabeth Trosman* and *Zia Faruqui*, Assistant U.S. Attorneys.

*Elizabeth H. Danello*, Assistant U.S. Attorney, entered an appearance.

Before: ROGERS, PILLARD and WILKINS, *Circuit Judges*.

## TABLE OF CONTENTS

Introduction.......................................................................... 2

I.  Facts and Prior Proceedings............................................. 4

II.  Wiretap Issues................................................................ 13

III.  Lay Opinion Testimony................................................. 32

IV.  Wired Plea Agreement................................................... 50

V.  Acquitted Conduct in Sentencing ................................. 53

Conclusion .......................................................................... 54

## Introduction

PER CURIAM: Henry Williams, Gezo Edwards, and William Bowman appeal their convictions by a jury of participation in a cocaine distribution scheme between January 2009 and April 2011. Following a multiyear investigation conducted by the Federal Bureau of Investigation ("FBI") and local police, Appellants and eleven other individuals were indicted on various federal drug offenses. Williams, Edwards, and Bowman were indicted for conspiracy to distribute and possess with intent to distribute cocaine. Bowman and Edwards also were indicted for multiple counts of using, carrying, and possessing a firearm

during a drug trafficking offense. And Bowman was indicted for several counts of distribution of cocaine. Of the fourteen individuals named in the original indictment, only Williams, Edwards, and Bowman went to trial. The jury found all three Appellants guilty of drug conspiracy, found Bowman guilty of two firearms possession charges and three cocaine distribution charges, and acquitted Edwards of the firearms charges. Williams was sentenced to fifty-one months in prison, Bowman to forty-five years in prison, and Edwards to life imprisonment.

Appellants challenge their convictions on multiple grounds:

(1) They contend that a series of wiretaps used by the Government to uncover the criminal scheme at issue here were attained improperly, in violation of both the Fourth Amendment and relevant statutes, and that the district court erred in refusing to suppress all evidence gained from those wiretaps.

(2) Williams contends that the district court erred in admitting portions of the lay opinion testimony provided by FBI Special Agent John Bevington, who was involved in the underlying investigation.

(3) Williams argues that the district court improperly denied his motion for a judgment of acquittal, because there was insufficient evidence to support his conviction.

(4) Williams challenges the district court's denial of requests to instruct the jury on multiple conspiracies and to give a limiting instruction concerning Bowman's and Edwards's bad acts.

(5) Williams also contends that the district court erred in denying his motion to sever his trial from that of Bowman and Edwards.

(6) Bowman contends that the Government violated his Fifth Amendment due process rights by improperly "wiring" his plea agreement to a plea by Williams.

(7) Edwards contends that the district court violated his Fifth and Sixth Amendment rights by increasing his sentence based on his possession of a firearm even though the jury had acquitted him of that conduct.

We affirm the judgments of conviction, with one exception. We hold that the district court erred in admitting portions of Agent Bevington's lay opinion testimony and that this error was not harmless. Therefore, we reverse Williams's conviction and remand his case to the district court for further proceedings. We do not reach Williams's other challenges to his conviction other than to hold that the district court did not err in denying his motion for a judgment of acquittal.

## I. Facts and Prior Proceedings

### A.

In late 2009, a joint task force of the FBI and the District of Columbia Metropolitan Police Department began investigating a suspected cocaine distribution operation based in Washington, D.C. In an effort to uncover the nature, scope, and membership of that operation, investigating agents reviewed pen registers of telephone calls, arranged undercover drug buys, obtained information from confidential sources, and conducted extensive physical surveillance. After concluding that traditional methods alone were insufficient to investigate the operation, the Government sought, and eventually obtained, judicial authorization for wiretaps on

three separate phone numbers associated with Bowman, who the Government suspected was a ringleader of the drug trafficking. *See United States v. Edwards*, 889 F. Supp. 2d 1, 5-6 (D.D.C. 2012).

The first of those wiretaps, which the Government obtained on December 7, 2010, authorized the interception of wire communications over Target Telephone 1 ("TT1"). *See id.* at 5. Just a few weeks later, however, the Government terminated that wiretap due to lack of activity on the TT1 phone line. *See id.* The Government did not seek reauthorization of the TT1 wiretap. Instead, it applied for a separate wiretap on Target Telephone 2 ("TT2"). *See id.* at 5-6. Special Agent Timothy Pak submitted an affidavit in support of the TT2 wiretap, averring that Bowman was utilizing the TT2 phone line "to discuss and facilitate drug trafficking in the Washington, D.C. area." Gov't's Jan. 13, 2011, TT2 Wiretap Affidavit ("Jan. 13 TT2 Aff.") ¶ 7. Agent Pak's affidavit asserted that the TT2 wiretap was necessary because the Government's "[n]ormal investigative procedures," *id.* ¶ 35 – including the use of confidential sources and undercover officers, physical surveillance, trash covers, and pen registers – had failed to reveal the full scope and nature of the drug trafficking operation. *See id.* ¶¶ 35-48. On January 13, 2011, the district court authorized the TT2 wiretap for an initial thirty days. *See Edwards*, 889 F. Supp. 2d at 6.

At the Government's requests, the district court granted three extensions of the TT2 wiretap. *See id.* The Government sought the first extension on February 14, 2011, relying on an updated affidavit from Agent Pak. That affidavit emphasized that reauthorization of the TT2 wiretap was necessary because, even after using the TT2 wiretap for a month alongside traditional investigative tools, agents had yet to

uncover the full scope and membership of the drug trafficking operation. *See* Gov't's Feb. 14, 2011, TT2 Wiretap Affidavit ("Feb. 14 TT2 Aff.") ¶¶ 34-55. The district court agreed and promptly reauthorized the TT2 wiretap for an additional thirty days. *See Edwards*, 889 F. Supp. 2d at 6.

On March 11, 2011, the Government requested another extension of the TT2 wiretap. Agent Pak's March 11, 2011, affidavit did not name Edwards – another suspected leader of the drug trafficking operation – as a potential target of the TT2 wiretap reauthorization. In that affidavit, Agent Pak reiterated his belief that the TT2 wiretap remained necessary to fill evidentiary gaps left by normal investigative procedures. *See* Gov't's March 11, 2011, TT2 Wiretap Application ("Mar. 11 TT2 Aff.") ¶¶ 25-41. The district court obliged and, on March 11, 2011, reauthorized the TT2 wiretap for another thirty-day period. *See Edwards*, 889 F. Supp. 2d at 6.

The Government then sought and obtained a third and final thirty-day reauthorization of the TT2 wiretap on April 8, 2011, again based on Agent Pak's view that the TT2 wiretap was necessary to investigate the full scope of the drug trafficking operation. *See id.*; Gov't's April 8, 2011, TT2 Wiretap Affidavit ("Apr. 8 TT2 Aff.") ¶¶ 31-50.

On March 21, 2011, while the TT2 wiretap was still operational on its second extension, the Government sought an order authorizing the interception of wire communications to and from Target Telephone 3 ("TT3"), another phone number associated with Bowman. *See Edwards*, 889 F. Supp. 2d at 6. As in his other affidavits, Agent Pak attested that the TT3 wiretap was necessary to determine the full nature and scope of the conspiracy, which called for further investigation notwithstanding the TT2 wiretap. *See* Gov't's Mar. 21, 2011,

TT3 Wiretap Affidavit ("Mar. 21 TT3 Aff.") ¶¶ 27-43. Notably, the Government's TT3 wiretap application was the first to name Edwards as a possible target of the wiretap. *See id.* ¶ 10(c). The district court authorized the TT3 wiretap, and, on April 15, 2011, reauthorized it for an additional thirty days. *See Edwards*, 889 F. Supp. 2d at 6.

Between January and April 2011, investigating agents employed the TT2 and TT3 wiretaps to intercept numerous telephone calls between Bowman, Edwards, Williams, and several other members of the suspected drug trafficking operation. Toward the end of the investigation, agents executed search warrants on a storage unit and various residences connected to Bowman and Edwards and seized cocaine, drug paraphernalia, several firearms, and ammunition.

**B.**

The Government arrested Williams, Edwards, and Bowman along with several other individuals and indicted them for various drug-related offenses. The operative superseding indictment charged Williams, Edwards, Bowman, and several other men with conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846. The superseding indictment also charged Bowman and Edwards with two counts of using, carrying, and possessing a firearm during a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1).[1] It charged Bowman with an additional count of firearm possession and three counts of unlawful distribution

---

[1] Those two firearm possession counts were later merged into one before the case was submitted to the jury.

of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).[2]

Appellants filed several pretrial motions during the early stages of the case. Williams moved to sever his trial from that of his co-defendants. Williams insisted that trying him alongside co-defendants facing much more serious charges would risk prejudicial spillover and allow the prosecution to benefit from guilt by association. The district court denied that motion, concluding that Williams failed to show a serious risk that a joint trial would prevent the jury from making a reliable judgment about his guilt or innocence. Around the same time, Bowman and Edwards moved to suppress evidence obtained from the TT2 and TT3 wiretaps on the ground that, in obtaining judicial approval of the wiretaps, the Government failed to satisfy the requirements of the Fourth Amendment and Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. § 2510 *et seq*. *See Edwards*, 889 F. Supp. 2d at 4-5.[3] The district court denied those suppression motions. *Id.* at 18. It held that the TT2 and TT3 wiretaps, and all subsequent reauthorizations, satisfied Title III's "necessity" requirement because traditional investigative techniques were insufficient to reveal the full scope of the suspected drug trafficking operation. *Id.* at 8-13. The district court further concluded that Appellants were not entitled to a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), because they failed to make a substantial showing that the purported omissions in the Government's

---

[2] The superseding indictment also charged Bowman with two counts of unlawful distribution of five grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii), but the Government later dismissed those counts.

[3] Williams filed a notice to adopt those motions.

wiretap applications were material. *Edwards*, 889 F. Supp. 2d at 14-18. Edwards filed more motions, some counseled and some *pro se*, reiterating his earlier claims and also arguing that agents violated Title III's "naming" and "prior applications" provisions. The district court denied each of those motions in a series of written memoranda and orders. *See, e.g.*, *Edwards*, 889 F. Supp. 2d at 18-23 (D.D.C. Sept. 16, 2012) (denying pre-trial motion for reconsideration); *id.* at 23-29 (D.D.C. Oct. 23, 2012) (same); *United States v. Edwards*, 904 F. Supp. 2d 7, 9-11 (D.D.C. 2012) (denying *pro se* motion for reconsideration); *United States v. Edwards*, 943 F. Supp. 2d 125, 127-29 (D.D.C. 2013) (denying *pro se* motion for new trial and other post-trial motions); *United States v. Edwards*, 994 F. Supp. 2d 1, 4-7 (D.D.C. 2013) (denying *pro se* post-trial motions); *United States v. Edwards*, 994 F. Supp. 2d 7, 9-10 (D.D.C. 2014) (same).

In the months leading up to trial, Bowman entered into plea negotiations. The Government offered Bowman a "wired" plea deal. Under the initial version of that deal, Bowman could plead guilty, and the Government would recommend a prison sentence capped at twenty-three years, but only if Williams also pleaded guilty to the drug conspiracy charge. If Williams pleaded guilty, he, in turn, would face no mandatory minimum and likely would face a guidelines sentencing range of twenty-seven to thirty-three months imprisonment. Bowman's counsel told the court that Bowman was willing to accept his half of the deal but "would hope that [the Government] would unwire it" from the condition that Williams also plead guilty. Status Hr'g Tr. 75 (Sept. 7, 2012). A month later, during jury selection, the Government offered a revised plea agreement to Bowman. Under that revised agreement, Bowman could plead guilty to a sentence of twenty-five years imprisonment, contingent upon Williams's acceptance of a plea offer of a thirty to

thirty-seven month prison sentence. On the eve of trial, Bowman's counsel notified the district court that his client did "not wish to engage in any discussions with the Government and does not wish to plead guilty based upon the offer that has been made to him." Trial Tr. 7 (Oct. 22, 2012). Williams, for his part, stated on the record that he also would not accept the Government's plea offer.

## C.

All three Appellants proceeded to trial. During its case-in-chief, the Government played audio recordings of phone calls obtained from the wiretaps, showed numerous surveillance videos, and presented testimony from investigating agents, narcotics experts, and cooperating witnesses. The Government offered evidence to show that Edwards and Bowman were the leaders of a cocaine-trafficking network in the Washington, D.C., area. According to one of the prosecution's cooperating witnesses, Edwards and Bowman repeatedly acquired large quantities of cocaine from California and used cross-country shipping pods to transport it to the Washington, D.C., area. The evidence suggested that they stored the cocaine in various locations, including an apartment in Capitol Heights, Maryland, and storage facilities in Hyattsville, Maryland. The Government adduced testimony that Edwards processed, weighed, and repackaged the cocaine into smaller blocks for resale to mid-level drug dealers. Bowman, in turn, distributed the repackaged cocaine to those mid-level dealers, usually on consignment. Another cooperating witness testified that Bowman typically would give the drugs to him "on consignment," and that he later would pay Bowman back with the proceeds earned from selling the drugs to individual customers. Trial Tr. 9, 21 (Nov. 5, 2012, p.m. session). The prosecution's evidence, including wiretap recordings and surveillance videos, also showed that Williams interacted with

the other defendants during the early half of 2011. Williams repeatedly called Bowman between January and March 2011, and met with Bowman on several occasions in mid-March 2011, including on March 12, March 15, and March 23, shortly after Bowman and Edwards, on or before March 10, had received a large shipment of cocaine.

The Government also presented the testimony of FBI Special Agent John Bevington, one of the lead investigating officers. On the second day of trial, the district court granted the Government's motion to qualify Agent Bevington as an expert witness "in the interpretation of words and phrases used by drug traffickers in this particular case." Trial Tr. 67 (Oct. 24, 2012, a.m. session). In his capacity as an expert on narcotics terminology, Agent Bevington translated many "coded" words that appeared in conversations between Bowman and other members of the alleged drug conspiracy. Over defense counsel's objections, the district court also permitted Agent Bevington to provide lay opinion testimony interpreting recorded calls between Bowman, Williams, and other co-conspirators.

**D.**

At the close of all the evidence, Williams moved for a judgment of acquittal, chiefly on the ground that the evidence was insufficient to prove his participation in the charged drug conspiracy. Drawing all inferences in favor of the prosecution, the district court orally denied the motion and found that a reasonable jury could find that Williams participated in the alleged conspiracy based on the nature and frequency of his contacts with Bowman. *See* Trial Tr. 96-97 (Nov. 13, 2012, p.m. session). During the final days of the trial, Edwards and Williams asked the district court to give a "multiple conspiracies instruction" to the jury, arguing that the prosecution's evidence, at most, established their

involvement in a different drug conspiracy from the one alleged in the superseding indictment. The district court rejected that request and declined to give the proposed instruction. *See generally* Final Jury Instructions, *United States v. Edwards*, No. 11-cr-129 (D.D.C.), ECF No. 591. After resolving other pending trial motions and hearing the parties' closing statements, the district court instructed the jury and then submitted the case to the jury for deliberation.

On November 16, 2012, the jury began its deliberations and delivered verdicts four days later. The jury found Bowman, Edwards, and Williams guilty of the drug conspiracy charge. On that charge, the jury held Bowman and Edwards responsible for five kilograms or more of cocaine and held Williams responsible for an amount less than 500 grams. The jury also found Bowman guilty of two firearm possession charges and all three remaining cocaine distribution charges. The jury acquitted Edwards on the firearm possession charge.

During Edwards's sentencing hearing, the district court granted the Government's request for a two-level increase in Edwards's guidelines calculation for possession of a dangerous weapon, pursuant to U.S. Sentencing Guideline § 2D1.1(b)(1). Even though the jury had acquitted him on the firearm possession count, the district court found by a preponderance of the evidence that Edwards possessed a firearm in furtherance of the drug trafficking conspiracy. The district court sentenced Edwards to life imprisonment, Williams to fifty-one months in prison for the conspiracy charge, and Bowman to an aggregate prison term of forty-five years in prison for his offenses. Appellants timely appealed.

## II. Wiretap Issues

Appellants' first challenge to their convictions rests on their contention that many of the Government's wiretap applications were flawed, requiring the suppression of all evidence gained from those wiretaps. They rest that challenge on four grounds. First, they argue that the district court erred by refusing to hold a hearing, pursuant to *Franks v. Delaware*, 438 U.S. 154, to determine whether the Government omitted material information from its wiretap applications. Second, they claim that by omitting that information, the Government violated the necessity requirement of Title III. Third, they argue that the information the Government did disclose was insufficient to establish the necessity of the wiretaps. And fourth, Edwards asserts that the Government unlawfully failed to name him in its March 11, 2011, wiretap affidavit. After setting forth the governing legal principles, we address each of these contentions in turn.

### A.

A defendant may seek to suppress the evidence gathered as a result of wiretap surveillance under two different legal theories: she can argue that the wiretap violated her rights under the Fourth Amendment, or that the wiretap failed to comply with the requirements of Title III. Appellants argue both here.

**1.** Appellants' Fourth Amendment claim is based on the Supreme Court's decision in *Franks v. Delaware*, 438 U.S. 154. *Franks* involved a defendant's challenge to a warrant affidavit that, according to the defendant, contained false statements. *Id.* at 157-58. The Court held that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the

warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Id.* at 155-56. This court has thereafter referred to such hearings as "*Franks* hearings." *See, e.g.*, *United States v. Maynard*, 615 F.3d 544, 550-51 (D.C. Cir. 2010); *United States v. Becton*, 601 F.3d 588, 594 (D.C. Cir. 2010). To obtain a *Franks* hearing, a movant "must show that (1) the affidavit contained false statements; (2) the statements were material to the issue of probable cause; and (3) the false statements were made knowingly and intentionally, or with reckless disregard for the truth." *Becton*, 601 F.3d at 594 (internal quotation marks omitted).

This court has extended *Franks* to apply not only where the Government is alleged to have made false statements but also where a defendant alleges that the Government "knowingly and intentionally (or with reckless disregard) omitted a fact that would have defeated probable cause." *United States v. Glover*, 681 F.3d 411, 419 (D.C. Cir. 2012); *accord United States v. Spencer*, 530 F.3d 1003, 1007 (D.C. Cir. 2008) (stating that "suppression also remains 'an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit,'" and noting that "[t]his latter exception also has been held to apply under certain circumstances to material omissions" (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984))). Although *Franks* involved a probable cause determination concerning a warrant affidavit, this court has applied *Franks* in the wiretap context as well. *See, e.g.*, *Maynard*, 615 F.3d at 550-51; *Becton*, 601 F.3d at 597-98.

Yet not just any omission is enough. This court's precedent is clear that to implicate the Fourth Amendment, and to require a *Franks* hearing, the omission alleged must be

such that, had the omitted information been provided to the authorizing court, it would have altered the court's conclusion that the wiretap was necessary. *See, e.g.*, *Becton*, 601 F.3d at 597 (finding "the Government's failure to disclose certain information bearing on the credibility of two confidential sources" unproblematic where the inclusion of that additional information "was [not] material" and "would not have defeat[ed] probable cause" (internal quotation marks omitted)). If a defendant makes such a showing, she would then be entitled to a hearing before the district court to determine whether suppression of that wiretap evidence is required under the Fourth Amendment. *See Franks*, 438 U.S. at 171-72. The court has not resolved whether a district court's decision not to hold a *Franks* hearing is reviewed under the clearly erroneous or *de novo* standard of review. *See Becton*, 601 F.3d at 594. It is unnecessary to do so here because, under either standard of review, we would find no error by the district court.

**2.** Appellants also contest the wiretaps at issue here by arguing that the Government failed to comply with the provisions of Title III in seeking the wiretap.

To approve a wiretap, a judge must determine that the wiretap is supported by both probable cause and necessity. 18 U.S.C. § 2518(3); *Glover*, 681 F.3d at 420. Appellants do not challenge the Government's probable cause showing,[4] but

---

[4] To demonstrate probable cause, the Government must show that there is probable cause for belief that: (1) "an individual is committing, has committed, or is about to commit a particular offense"; (2) "particular communications concerning that offense will be obtained through such interception"; and (3) "the facilities from which . . . the wire . . . communications are to be intercepted

instead argue that the affidavits the Government submitted to support its wiretap applications did not demonstrate that each wiretap was necessary.

To demonstrate that a wiretap is necessary, Title III requires the Government to provide "a full and complete statement as to whether or not other investigative procedures have been tried and have failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). The authorizing court must then determine that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous" on the basis of this statement. *Id.* § 2518(3)(c). This necessity requirement is satisfied when "traditional investigative techniques have proved inadequate to reveal the operation's full nature and scope." *Becton*, 601 F.3d at 596 (internal quotation marks omitted). In assessing the necessity of a wiretap application, courts must "giv[e] close scrutiny to applications challenged for noncompliance and . . . reject[] generalized and conclusory statements that other investigative procedures would prove unsuccessful." *United States v. Johnson*, 696 F.2d 115, 123 (D.C. Cir. 1982) (quoting *United States v. Williams*, 580 F.2d 578, 588 (D.C. Cir. 1978)). "Nonetheless, the statutory command was not designed to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted." *Williams*, 580 F.2d at 588 (internal quotation marks omitted). It is sufficient for the Government to show that "other techniques are impractical under the circumstances and that it would be

_____

are being used . . . in connection with the commission of such offense." 18 U.S.C. § 2518(3)(a)-(b), (d).

unreasonable to require pursuit of those avenues of investigation." *Id.* (internal quotation marks omitted).

An "aggrieved person" may move to suppress the contents of any intercepted communication and any evidence derived therefrom where "the communication was unlawfully intercepted." 18 U.S.C. § 2518(10)(a)(i). This provision "was not intended to reach every failure to follow statutory procedures," but applies where there is a "failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures." *United States v. Chavez*, 416 U.S. 562, 574-75 (1974) (quoting *United States v. Giordano*, 416 U.S. 505, 527 (1974)). This includes "the statutorily imposed preconditions to judicial authorization" of a wiretap, such as necessity. *United States v. Donovan*, 429 U.S. 413, 436 (1977) (citing 18 U.S.C. § 2518(3)(c)); *see also United States v. Carter*, 449 F.3d 1287, 1292-93 (D.C. Cir. 2006).

An affidavit offered in support of a wiretap application enjoys a "presumption of validity." *Maynard*, 615 F.3d at 550 (quoting *Franks*, 438 U.S. at 171) (concerning affidavits in support of search warrants). The court reviews an authorizing court's necessity determination for abuse of discretion, but does not give a second layer of deference to a district court's assessment of the authorizing court's necessity determination. *See Glover*, 681 F.3d at 419-20. In assessing a district court's denial of a wiretap suppression motion, the court reviews the district court's legal conclusions *de novo* and its factual findings for clear error. *United States v. Eiland*, 738 F.3d 338, 347 (D.C. Cir. 2013).

**B.**

We turn now to Appellants' arguments seeking to suppress the evidence derived from the wiretaps.

**1.** Appellants first argue that the district court erred by refusing to hold a *Franks* hearing concerning certain omissions from the Government's wiretap applications. Because the omissions were not material, we reject the argument.

Appellants allege, and the Government does not dispute, that the Government's wiretap affidavits did not disclose two "investigative procedures," 18 U.S.C. § 2518(1)(c), related to its investigation of Bowman. First, the Government's initial three applications seeking to wiretap Bowman's TT2 phone failed to disclose the existence of a pen register[5] on TT3, another of Bowman's phones. *See generally* Jan. 13 TT2 Aff.; Feb. 14 TT2 Aff.; Mar. 11 TT2 Aff. The Government had been operating the TT3 pen register for nearly a year when it first sought to wiretap Bowman's TT2 phone, and by March 2011, when it submitted its third application for a wiretap on TT2, the Government had recorded over two thousand activations on TT3. *See* Mar. 21 TT3 Aff. ¶ 23.

Second, in the March 11 Affidavit, the Government did not disclose the existence of an additional confidential source, CS-4, who had known Bowman and Edwards for over ten years, and who, in late February 2011, informed the Government that he or she knew that the two were "working in concert to traffic[] in narcotics." Apr. 8 TT2 Aff. ¶ 35.

---

[5] "A pen register is a mechanical device that records the numbers dialed on a telephone by monitoring the electrical impulses caused when the dial on the telephone is released. It does not overhear oral communications and does not indicate whether calls are actually completed." *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 161 n.1 (1977).

Neither of these omissions, however, would have "defeat[ed] probable cause," and therefore, the district court was not required to hold a *Franks* hearing concerning those omissions. *Becton*, 601 F.3d at 597 (quoting *Spencer*, 530 F.3d at 1007). While pen registers cannot "convey to the government the substance of [Bowman's] calls," *Eiland*, 738 F.3d at 349, they can nonetheless reveal relevant and important information. And sometimes they uncover data that can make a wiretap unnecessary.[6] Here, however, Appellants have not shown that pen register data rendered the wiretaps unnecessary. *See Franks*, 438 U.S. at 171-72.

The same is true of the Government's use of CS-4. CS-4 provided some information to the Government concerning Bowman and Edwards's relationship and participation in drug trafficking. But that information was not sufficient to

---

[6] *See, e.g.*, *Smith v. Maryland*, 442 U.S. 735, 737 (1979) (police obtained a search warrant through use of a pen register, where pen register demonstrated petitioner was responsible for robbing victim in question after victim began receiving threatening phone calls from robber subsequent to robbery); *United States v. Geraldo*, 271 F.3d 1112, 1115 (D.C. Cir. 2001) (describing pen register data as part of the evidence submitted to a magistrate deemed sufficient to justify the issuance of a search warrant, without resort to a wiretap); *United States v. Clay*, 34 F.3d 1070 (8th Cir. 1994) (unpublished) (pen register data led to arrest of a drug trafficking co-conspirator where pen register data linked one co-conspirator to the other); *United States v. Thornton*, 746 F.2d 39, 41-42 (D.C. Cir. 1984) (explaining that pen register data, among other evidence, allowed law enforcement to secure – without the use of a wiretap – several search warrants concerning an alleged gambling enterprise based on the fact that the pen registers showed that numerous calls were placed to the location in question "within one hour of the prime gambling period"); *United States v. Louderman*, 576 F.2d 1383, 1386 (9th Cir. 1978) (pen register data used to prove wire fraud).

establish either the source of Bowman's drugs, or the hierarchy of his organization. Nor was continued reliance on CS-4 reasonably likely to reveal that information, which the Government needed to uncover fully and prosecute effectively the conspiracy at issue here. Had the Government disclosed the existence of CS-4, it would not have altered the authorizing court's necessity determination, and therefore, the Government's omission of that information did not require a *Franks* hearing.

**2.** Appellants next argue that the Government violated Title III's necessity requirement, 18 U.S.C. § 2518(1)(c), by failing to include the omitted information regarding the pen register on TT3 and confidential source CS-4. We reject Appellants' contention that the fruits of the resulting wiretaps must be suppressed. Although we agree that the Government could have, and should have, provided the omitted information discussed above in each relevant wiretap application, the Government provided the bare minimum necessary to comply with Title III.

The Government has offered no reason why it could not have provided the authorizing court with the omitted information concerning the pen register on TT3 and the existence of CS-4, consistent with the statutory requirement of a "full and complete statement." *Id.* Both omissions were relevant to the necessity determination because both shed further light on the breadth of the Government's investigation and the alternative means the Government had to investigate the conspiracy at issue, short of the invasive option of wiretap surveillance.

Nonetheless, the Government's failure to include this information in its wiretap applications did not violate the necessity requirement of Title III. The Government informed

the authorizing court of the existence of the pen register on TT2, *see, e.g.*, Jan. 13 TT2 Aff. ¶¶ 30-34, and further explained why, in this particular case, pen register data was insufficient to reveal the "full nature and scope" of the conspiracy. *Becton*, 601 F.3d at 597; *see also id.* (finding that "[t]he Government's omission of information that a previous search had yielded incriminating information did not make its affidavit infirm"); Jan. 13 TT2 Aff. ¶¶ 47-48 (asserting that while pen registers are useful "in establishing relationships and patterns of operations, . . . they provide little direct evidence as to the significance of the telephone calls"). The activations recorded by the pen register on TT3 were no more illuminating. Consequently, the inclusion of information concerning the pen register on TT3 could not have altered the authorizing court's necessity determination.

The same is true of the Government's use of CS-4. Appellants have not shown that, had the authorizing court known that CS-4 was aiding the Government in its investigation, the court would have found necessity lacking because the available investigative techniques were sufficient to establish the source of Bowman's drugs or the hierarchy of his organization. *See supra* Part II.B.1. This information could not have altered the authorizing court's necessity determination, and thus the Government was not required to include it in its wiretap application. To this extent, the Government's omission "was not material, because it did not undermine the government's ability to prove the need for the . . . wiretap." *Becton*, 601 F.3d at 597 (internal quotation marks omitted).

By omitting the information concerning the pen register on TT3 and the Government's use of CS-4, the Government did not provide the authorizing court with as complete a picture of its investigation as it could have, making the

authorizing court's necessity determination potentially less well-informed. Although we conclude that the Government's omissions were not material to Title III's necessity requirement, the Government could have, and should have, included this information in its wiretap affidavits. As the Supreme Court stated in *United States v. Donovan*, the "strict adherence by the Government to the provisions of Title III would . . . be more in keeping with the responsibilities Congress has imposed upon it when authority to engage in wiretapping or electronic surveillance is sought." 429 U.S. at 440 (quoting *Chavez*, 416 U.S. at 580). Absent some persuasive explanation for an omission, we anticipate that the Government will provide such information to authorizing courts in the future.

**3.** Appellants next argue that the information the Government did disclose in its wiretap application was insufficient to demonstrate the wiretap's necessity when considered in combination with the omission of the pen register on TT3 and CS-4. We disagree. We have determined already that the Government's omission of information concerning the pen register on TT3 and the existence of CS-4 did not negate the wiretap's necessity. Appellants fare no better when those omissions are viewed in combination with Appellants' arguments concerning the information that the Government did include in its wiretap application.

Focusing first on the January 13 Affidavit, Appellants argue that the wiretap was unnecessary because the Government's surveillance of Bowman was bearing fruit and likely would continue to do so, given that "Bowman was hardly circumspect" when it came to carrying out his drug operations. Appellants' Br. 27-29. In particular, Appellants highlight several instances when the Government was able to observe Bowman selling cocaine to undercover operatives

and others. *See* Jan. 13 TT2 Aff. ¶¶ 19-20 (describing two controlled drug purchases a confidential source made from Bowman); Trial Tr. 83-84 (Oct. 25, 2012, p.m. session) (testimony of Government agent recounting his surveillance of Bowman during a confidential informant's purchase of drugs from Bowman). Appellants' arguments are unavailing.

The Government has adequately demonstrated that such surveillance and undercover operations were unlikely to provide it with the information needed to uncover the "full nature and scope" of the suspected crime at issue, *United States v. Sobamowo*, 892 F.2d 90, 93 (D.C. Cir. 1989) (quoting *United States v. Brown*, 823 F.2d 591, 598 (D.C. Cir. 1987)), namely, the source of Bowman's cocaine, and the hierarchy of Bowman's organization. In *Becton*, the court similarly found necessity where "normal investigative procedures ha[d] been probative in proving that an ongoing illegal narcotics business [wa]s operating" because "the FBI had been unable to determine the identities of other co-conspirators who supplied and transported drugs into D.C. and who assisted in local redistribution using these methods." 601 F.3d at 596 (internal quotation marks omitted). Appellants fault the Government for not "squarely address[ing]" "how well-placed the informants were, or how close they were to Bowman," Appellants' Reply Br. 12, but the Government persuasively suggests that Bowman was unlikely to give his customers information about where he kept his drugs, or who was supplying them to him. Had he done the former, he would have risked his drugs being stolen. Had he done the latter, he would have risked having his customers go straight to his drug source. As the district court noted, "the fact that Bowman was willing to sell narcotics to the undercover officer and confidential sources he barely knew does not negate [the Government's] observation that Bowman kept certain information, such as the location of his

stash house, from his customers." *Edwards*, 889 F. Supp. 2d at 9; *see also Eiland*, 738 F.3d at 349 (explaining that the placement of informants does not demonstrate lack of necessity because those informants were not close enough to the core members of the conspiracy to "have access to the most closely held secrets"); *United States v. Fernandez*, No. 12-cr-445, 2013 WL 503966, at *2 (S.D.N.Y. Feb. 7, 2013) (noting that individuals involved in a drug trade "were unlikely to reveal to an informant the source of their drugs or the manner in which the narcotics were transported").

Nor was the Government required in these circumstances to expect that physical surveillance would provide such information. The Government notes that there was only so much surveilling of Bowman it could do before Bowman might catch on to the surveillance. *See* Jan. 13 TT2 Aff. ¶ 40 (asserting that "prolonged or regular surveillance of the movements of the subjects would most likely be noticed, thereby causing them to become more cautious in their illegal activities, or to change the manner in which they conduct their illegal activity, thus further stalling law enforcement efforts"). And while following Bowman's movements might have given the Government some idea of where Bowman kept at least some of his drugs, the Government's submissions to the authorizing court established that continued surveillance could not be expected to provide it the breadth of understanding concerning the location of those drugs, nor the certainty that wiretap surveillance in these circumstances would likely provide. *See United States v. Scurry*, 821 F.3d 1, 17-18 (D.C. Cir. 2016) (finding the Government's use of physical surveillance insufficient to defeat necessity where the defendant "took evasive maneuvers to avoid physical surveillance, [and] consummated drug sales indoors or inside cars," and rejecting the defendant's argument that "the government could have searched [the defendant's] known

stash house or prosecuted [the defendant] on the evidence of the controlled narcotics transactions alone").

Appellants also claim that the disclosed pen register on TT2 provided the Government with sufficient information to preclude the need for a wiretap. But as discussed above, the pen registers at issue here did not reveal, nor was their continued use reasonably likely to reveal, sufficient information to render the wiretaps unnecessary.

Accordingly, the authorizing court did not abuse its discretion by finding the wiretaps sought by the Government here necessary. To the extent that Appellants contest the Government's February 11 Affidavit on the same necessity grounds as the January 13 Affidavit, we affirm the necessity determination as to the February 11 Affidavit for the same reasons.

**4.** Appellants' challenge to the Government's March 11 Affidavit focuses on the Government's failure to name or discuss Edwards anywhere in the Affidavit. They assert that this omission violated Title III's "naming" and necessity requirements, and thus request the suppression of the fruits of the wiretap approved based on that affidavit.

**a.** Pursuant to 18 U.S.C. § 2518(1)(b)(iv), the Government is required to include information concerning "the identity of the person, if known, committing the offense and whose communications are to be intercepted." The Supreme Court has interpreted this provision to require the identification of an individual if the Government (1) "has probable cause to believe that the individual is engaged in the criminal activity under investigation" and (2) "expects to intercept the individual's conversations over the target telephone." *Donovan*, 429 U.S. at 428. This naming requirement applies to individuals placing calls to the target

telephone as well as to individuals making calls from the target telephone. *See id.* at 424-28. The Supreme Court in *Donovan* held that a violation of § 2518(1)(b)(iv) did not constitute grounds for suppression under § 2518(10)(a)(i), where the failure to name an individual in the wiretap application was not made "knowingly . . . for the purpose of keeping relevant information from the District Court." 429 U.S. at 436 n.23; *see also id.* at 439.

Edwards argues that, pursuant to § 2518(1)(b)(iv), the Government was required to name him in its March 11 Affidavit because the Government at that point had probable cause to believe both that he was involved in the cocaine distribution conspiracy at issue and that his communications would be intercepted by the wiretap. The Government does not argue that it lacked probable cause that Edwards was involved in the conspiracy, but instead argues that it had no reason to expect that the March 11 wiretap would intercept Edwards over Bowman's TT2 phone specifically (as opposed to over Bowman's TT3 phone).[7]

---

[7] According to the 2014 edition of the United States Attorneys' Manual, the Government's current policy goes beyond the minimum required by 18 U.S.C. § 2518 by mandating the naming in all wiretap affidavits of each person "whose involvement in the alleged offenses is indicated, even if not all those persons are expected to be intercepted over the target facility or at the target location." U.S. Att'ys' Manual, Crim. Resources Manual, 28 Electronic Surveillance – Title III Applications ¶ E (2014 ed.), https://www.justice.gov/usam/criminal-resource-manual-28-electronic-surveillance-title-iii-applications (last visited July 6, 2016). Appellants argue that the Government's policy therefore required it to name Edwards in its March 11 Affidavit. However, such a policy is not judicially enforceable in a criminal case, *see United States v. Kember*, 648 F.2d 1354, 1370 (D.C. Cir. 1980), nor

By March 2011, the Government had captured pen register data showing that Edwards and Bowman had been in constant phone contact for at least a year. *See* Mar. 21 TT3 Aff. ¶ 23 (displaying a chart cataloging 939 phone activations between Edwards and Bowman since January 2010). However, this contact occurred strictly over TT3. *Id.* At no point during the three months the Government had been monitoring TT2 had Bowman received a single call from Edwards on that phone. As the district court noted, "[d]espite numerous opportunities to do so, the Defendant has never contested the Government's assertion that the pen register on TT2 did not show any calls between Bowman and telephone numbers known or believed to be associated with Edwards." *Edwards*, 889 F. Supp. 2d at 21 (internal quotation marks omitted). Thus, it was reasonable in this context for the Government to have expected any phone communications that were going to occur between Bowman and Edwards would occur over TT3, not TT2.

To get around the Government's reasonable inferences from Edwards's past communication pattern, Edwards contends that even if he was not likely to call Bowman on TT2, the Government should have expected to pick up Edwards's voice in the background of the TT2 wiretap because the Government had obtained some evidence suggesting that Bowman and Edwards had met on at least two occasions. Although the Government acknowledges that GPS data showed Bowman near an address associated with Edwards on two occasions, *see* Gov't's Opp'n Br. at 4, *United States v. Edwards*, No. 11-cr-129 (D.D.C. Oct. 20, 2012),

---

is it relevant to whether the Government had probable cause to believe that Edwards's conversations would be captured by TT2.

28

ECF No. 517, Edwards's argument is nonetheless unpersuasive. First, it is not clear that Title III's naming provision applies to the identity of individuals whose background conversations might be expected to be overheard during intercepted wire communications. We have found no authority on point, nor have the parties provided any. According to Appellants, "[t]he trial judge correctly concluded that the naming requirement extends to persons who might be overheard in the background of an intercept," Appellants' Br. 59 & n.173 (citing *Edwards*, 889 F. Supp. 2d at 25-26), but this is incorrect. Although the district court stated that "the plain language" of 18 U.S.C. § 2518(b) "would appear to encompass all communications recorded as a result of the wiretap, regardless of . . . whether the conversation took place over, or merely in the vicinity of, the target telephone," the court also noted that it had been unable to locate any legal authority on the point, nor had the parties offered any, and it went on to state that "the Court need not resolve the scope of the Government's burden in this respect because the Defendant failed to show that he should have been named as a target even if the *Donovan* requirements applied to background[] conversations." *Edwards*, 889 F. Supp. 2d at 25-26.

Assuming, without deciding, that such overheard conversations do implicate Title III's naming requirement, Appellants fare no better. Even if Bowman and Edwards were in the same room, and Edwards was having a conversation with a third individual at the same time that Bowman was talking on TT2 to a fourth individual, it is unlikely that Bowman would stop speaking, and Edwards would start speaking, at just the right time, such that the TT2 wiretap would clearly pick up Edwards's conversation and enable the Government reliably to identify his voice. When viewed in concert with the fact that the Government had

evidence of only a few instances in which Bowman and Edwards may have met, it was not unreasonable for the Government to expect that it would not intercept Edwards's voice in the background over the TT2 wiretap.

This conclusion is supported by the fact that, during the period from January through March 2011, the Government never intercepted Edwards's voice in the background over TT2, even during those times when the Government suspected Bowman and Edwards met. *See Edwards*, 889 F. Supp. 2d at 28. Thus, just as the Government lacked grounds to expect that Edwards would call Bowman on TT2, since he had not done so during the two and a half months it had intercepted calls placed from or to TT2, the Government had no reason on this record to expect that Edwards's voice would be captured in the background of a TT2 call.

Edwards also points out that on March 8-9, 2011, the Government ran an "ELSUR" electronic surveillance database check to determine whether Edwards had been the subject of prior intercept orders. The ELSUR check was disclosed in the wiretap application for TT3 submitted by the Government on March 21, 2011. Mar. 21 TT3 Aff. ¶ 49. Edwards argues that this fact lends further support to his contention that the Government was required to name him in its March 11 wiretap application. At best, the ELSUR check demonstrates that the Government had probable cause to believe Edwards was involved in the investigated conspiracy and that the Government anticipated that he would become a target of a wiretap. *See Edwards*, 889 F. Supp. 2d at 20-21. It says nothing about whether Edwards's communications were likely to be intercepted over TT2. Accordingly, this argument also lacks merit.

Edwards also claims that the Government violated 18 U.S.C. § 2518(1)(e) by failing to disclose in its March 11 Affidavit all prior wiretap applications that mentioned Edwards. However, the prior application requirement applies only to those individuals who must be named in the wiretap application in the first place. *See* 18 U.S.C. § 2518(1)(e) (requiring the disclosure of previous applications only for "the same persons . . . specified in the application"). Because the Government was not required to name Edwards in the March 11 Affidavit, it was also not required to disclose prior applications naming Edwards.

We therefore hold that the district court did not err in denying Edwards's motion to suppress the fruits of the March 11 wiretap. To the extent Edwards seeks a *Franks* hearing based on these same naming requirement claims, *see* Appellants' Br. 62-63, 66; Appellants' Reply Br. 30, we reject the contention for the same reasons.

**b.** Appellants jointly argue that the Government's omission of any information concerning Edwards from its March 11 Affidavit, when combined with the wiretap application's other alleged deficiencies discussed above, *see supra* Parts II.B.1-II.B.3, violated Title III's necessity requirement, requiring the suppression of all evidence derived from the March 11 wiretap. They claim that the Government's alleged knowledge about Edwards and his connection to Bowman proves that the Government knew that Edwards was the source of Bowman's supply. The March 11 wiretap, according to Appellants, was therefore unnecessary because the Government already knew that Edwards was Bowman's drug supplier. Appellants are incorrect. Title III's necessity requirement obligates the Government to provide "a full and complete statement" concerning only "whether or not other investigative procedures have been tried and failed or

why they reasonably appear to be unlikely to succeed if tried." 18 U.S.C. § 2518(1)(c). Title III does not require the Government to disclose every individual whom the Government suspects might be involved in the allegedly criminal activity. It requires only that the Government name those individuals "if known, committing the offense and whose communications are to be intercepted." *Id.* § 2518(1)(b)(iv).

Appellants contend that had the Government included information about Edwards in its March 11 Affidavit, it would have been clear to the authorizing court that no further wiretap surveillance was necessary because the information would have demonstrated that the Government already knew the source of Bowman's drugs: Edwards. We disagree.

First, it is not clear that the Government had firm information identifying Edwards as Bowman's supplier. The Government acknowledges that "investigators . . . had reason to *suspect* Edwards was involved" but maintains that "they certainly did not have *proof* he was Bowman's conduit to imported cocaine." Appellee's Br. 58-59. Without firm proof, the Government persuasively contends that "holes remained in the evidence that could only reasonably be filled by a wiretap." *Id.* at 58 (quoting *Eiland*, 738 F.3d at 349).

Second, even if the Government had included in its March 11 application discussion of Edwards and had noted its suspicion that he was Bowman's source, we are not persuaded that it would have changed the authorizing court's necessity analysis. Appellants claim in conclusory fashion that if the Government had discussed Edwards in the March 11 application, it would have "caused the district judge to scrutinize more carefully the March 11th application," Appellants' Br. 55, but Appellants fail to specify how such

supposed close scrutiny would have changed the court's necessity analysis.

Like Appellants' other claims concerning the alleged deficiencies of the Government's wiretap applications, we find their arguments concerning the Government's decision not to name Edwards in its March 11 Affidavit unpersuasive. Accordingly, we affirm the district court's finding that the Government's March 11 Affidavit did not violate Title III's naming or necessity requirement.

## III. Lay Opinion Testimony

Appellants also contend, renewing objections they made before and during trial, that the district court erred in allowing lay opinion testimony by FBI Special Agent John Bevington that circumvented the requirements of Federal Rules of Evidence 701, 702, and 704. Specifically, they contend that Agent Bevington's testimony conflated expert opinion with lay opinion testimony by presenting as lay testimony interpretations of audio and video recordings that were clearly based on his expertise as an FBI agent. This error was not harmless as to Williams, they contend, because Agent Bevington's testimony failed to adhere to limitations on expert testimony and was used by the Government to establish Williams's (and to some extent Bowman's) guilt.

Our review of the admission of Agent Bevington's lay opinion testimony is for abuse of discretion. *See United States v. Williams*, 212 F.3d 1305, 1308 (D.C. Cir. 2000). Our evaluation of the harmlessness of any such error proceeds under the standard in *Kotteakos v. United States*, 328 U.S. 750, 764-65 (1946). *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988). The Government has the

burden to show any error was not prejudicial. *See United States v. Smart*, 98 F.3d 1379, 1390 (D.C. Cir. 1996).

In view of our opinion in *United States v. Hampton*, 718 F.3d 978 (D.C. Cir. 2013), which was decided after Appellants' trial, the Government concedes that some of Agent Bevington's lay opinion testimony was inadmissible under Federal Rule of Evidence ("FRE") 701 for failing to establish the bases for his opinion but maintains that any error was harmless. We agree and find other error as well. We therefore conclude that the admission of Agent Bevington's lay opinion testimony was error under FRE 701 and that the error was not harmless as to Williams. Accordingly, we reverse Williams's conviction and remand his case to the district court for further proceedings.

**A**.

FRE 701 provides that a witness who is not testifying as an expert may only provide testimony regarding his or her lay opinion where it is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge" of the sort that is properly the subject of expert opinion testimony under FRE 702. FRE 701 was designed to ensure that any opinions offered by a lay witness are based on personal, "first-hand knowledge or observation," Fed. R. Evid. 701 adv. comm. note (1972 proposed rule), and "a process of reasoning familiar in everyday life," Fed. R. Evid. 701 adv. comm. note (2000 amend.) (quoting *State v. Brown*, 836 S.W.2d 530, 549 (Tenn. 1992)). The "prototypical example[s]" of lay opinion testimony envisioned by the Advisory Committee when proposing to add subsection (c) were opinions regarding "items that cannot be described factually in words apart from inferences," such as size, degrees of darkness, speed, distance,

or whether a person appeared sad or angry. Fed. R. Evid. 701 adv. comm. note (2000 amend.) (quoting *Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1196 (3d Cir. 1995)). The addition of subsection (c) was intended to preclude litigants from proffering an expert in lay witness's clothing and thereby avoid the disclosure and other requirements for expert opinion testimony under FRE 702. *See id.* (citing *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997)).

FRE 702 addresses expert testimony. It provides that a witness who is "qualified as an expert by knowledge, skill, experience, training, or education" may testify about his or her opinion where: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." These factors reflect that the Supreme Court has placed "gatekeeping" responsibilities on the trial courts "at the outset" and thereafter during trial to ensure that expert testimony is sufficiently reliable to help, as opposed to confuse and hinder, the jury. *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 592, 597 (1993). The Advisory Committee contemplated that this could be done through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction," which it considered especially important in order to inform the jury of the limits of expert testimony. Fed. R. Evid. 702 adv. comm. note (2000 amend.) (quoting *Daubert*, 509 U.S. at 595). To facilitate the evaluation of reliability, expert opinion testimony is subject to disclosure requirements. *See* Fed. R. Evid. 703 & 705; *see also* Fed. R. Civ. P. 26(a)(2); Fed. R. Crim. P. 16(a)(1)(G). In addition, FRE 704(b) prohibits an

expert witness from "stat[ing] an opinion about whether [a] defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense" as such matters "are for the trier of fact alone."

The court held in *United States v. Wilson*, 605 F.3d 985, 1026 (D.C. Cir. 2010), that "an individual without personalized knowledge of a specific drug conspiracy may not testify about drug topics that are beyond the understanding of an average juror under Rule 701. Such a witness may be permitted to testify only as an expert under Rule 702." Lay opinion is proper when it is based upon personal knowledge of events that occurred in the case being tried, because "[a]n individual testifying about the operations of a drug conspiracy because of knowledge of that drug conspiracy has 'particularized' knowledge and should be admitted as a lay witness." *Id.* On the other hand, "an individual testifying about the operations of a drug conspiracy based on previous experiences with other drug conspiracies has 'specialized' knowledge and – provided his testimony meets the rule's enumerated requirements – should be admitted as an expert." *Id.* The court has "drawn that line because knowledge derived from previous professional experience falls squarely 'within the scope of Rule 702' and thus by definition outside of Rule 701." *United States v. Smith*, 640 F.3d 358, 365 (D.C. Cir. 2011) (quoting FRE 701(c)).

More recently, in *Hampton*, 718 F.3d at 981-84, the court held that the district court erred in admitting, over a proper objection, lay opinion testimony by an FBI agent interpreting recorded conversations between a defendant and an alleged co-conspirator without requiring him to disclose the "objective bases" of his opinion. As a consequence, FRE 701's requirements were not met and the jury was denied the information it needed in order to exercise its fact-finding

function by independently assessing the FBI agent's lay opinion. The court adopted the analysis of the Second Circuit Court of Appeals stating: "[W]hen a witness has not identified the objective bases for his opinion, the proffered opinion obviously fails completely to meet the requirements of Rule 701, first because there is no way for the court to assess whether it is rationally based on the witness's perceptions, and second because the opinion does not help the jury but only tells it in conclusory fashion what it should find." *Id.* at 981 (quoting *United States v. Rea*, 958 F.2d 1206, 1216 (2d Cir. 1992)). The court concluded that the proffered bases for the FBI agent's opinion – namely, his having listened to "all of the [recorded] calls" and his "knowledge of the entire investigation" – was inadequate because its lack of specificity invited "the risk that he was testifying based upon information not before the jury, including hearsay" and left the jury with "no way of verifying his inferences or of independently reaching its own interpretations" as FRE 701 requires. *Id* at 982-83 (quoting *United States v. Grinage*, 390 F.3d 746, 750 (2d Cir. 2004)). Additionally, the court emphasized that "[j]udicial scrutiny of a law-enforcement witness's purported basis for lay opinion is especially important because of the risk that the jury will defer to the officer's superior knowledge of the case and past experiences with similar crimes." *Id* at 981-82 (citing *Grinage*, 390 F.3d at 750-51).

As noted in *Hampton*, 718 F.3d at 983, the court's analysis reflects similar concerns the court has expressed with regard to the Government's use of overview and summary witnesses to anticipate or interpret evidence for the jury, *see United States v. Moore*, 651 F.3d 30, 57 (D.C. Cir. 2011), concerns shared by other circuits, *see United States v. Garcia*, 413 F.3d 201, 210-17 (2d Cir. 2005); *United States v. Casas*, 356 F.3d 104, 117-20 (1st Cir. 2004). *See also United States v. Lemire*, 720 F.2d 1327, 1348-50 (D.C. Cir. 1983).

Subsequent to *Hampton*, the court held in *United States v. Miller*, 738 F.3d 361, 373 (D.C. Cir. 2013), that the admission of lay opinion testimony by two FBI agents and a detective who did not "set forth the specific bases (events, other calls, seizures of contraband, etc.) upon which their opinions rested . . . other than broad claims about knowledge they had gained from the investigation" is plain error because the jury had "no effective way to evaluate their opinions."

**B.**

At trial, Agent Bevington provided two forms of opinion testimony: lay opinion testimony interpreting recorded conversations and other interactions between the alleged co-conspirators that he had listened to or observed during the FBI's investigation, and expert opinion testimony on "the interpretation of words and phrases used by drug traffickers." Trial Tr. 67 (Oct. 24, 2012, a.m. session). To distinguish between the two, the prosecutor generally inquired about Agent Bevington's "expertise" or "expert opinion" when seeking expert opinion testimony, and his "experience in this case" or something similar when seeking lay opinion testimony. In relation to Williams, however, the prosecutor did not elicit expert opinion testimony regarding the meaning of particular words or phrases. Instead, all of Agent Bevington's testimony interpreting wiretap recordings of phone conversations and, in a few instances, surveillance videos of meetings between Williams and Bowman was offered as lay opinion testimony. These recorded interactions between Williams and Bowman involved vague language and ambiguous conduct, but neither explicitly referred to cocaine nor showed Williams receiving cocaine from Bowman. Nonetheless, Agent Bevington's testimony interpreted them for the jury as relating to the buying and selling of cocaine.

On direct examination, the prosecutor generally asked what opinion Agent Bevington had regarding the meaning of a specific recording based on his "experience in the investigation," "prior calls that he had listened to in the investigation," or something similar. For example, after playing a wiretap recording of a March 20, 2011, phone conversation between Bowman and Williams, the prosecutor asked Agent Bevington: "Based upon your experience with this investigation and the phone conversations that you've intercepted, do you have an opinion of what Mr. Williams was referring to when he stated, quote, [']I got one that is going to go as soon as I get it from you and then I'm going to get the one for me so is two possible?[']" Agent Bevington testified: "Yes. He had a customer that wanted a quantity of cocaine but he also wanted a quantity of cocaine for himself." Trial Tr. 52-53 (Nov. 8, 2012, p.m. session).

At times, however, the prosecutor instead asked for Agent Bevington's opinion in reference to his review of specific evidence. For example, after playing a wiretap recording of a March 12, 2011, phone conversation between Bowman and Williams, the prosecutor asked: "[B]ased upon the other interceptions involving Mr. Bowman that we've listened to from March 12th of 2011, and your observations of the surveillances of Mr. Bowman that day, what did you understand Mr. Bowman to be referring to when he told Mr. Williams, quote, 'I got a couple of other people coming to see me, but you know what I mean, I don't want all of you, everybody to come at the same time'?" Agent Bevington testified: "He was telling Mr. Williams that he had other customers that he was going to be meeting with, and he didn't want all the customers to arrive at the same time." Trial Tr. 73-74 (Nov. 8, 2012, a.m. session). On cross-examination, when defense counsel asked whether his opinions regarding the meaning of the conversations and interactions between

Bowman and Williams were "based on what [he] learned in this investigation[,]" Agent Bevington testified: "Right, based on what I overheard on the phone and what I saw in surveillance, yes." Trial Tr. 65 (Nov. 9, 2012, a.m. session).

The Government properly concedes in light of *Hampton* that some of Agent Bevington's lay opinion testimony about Williams's conversations with Bowman was inadmissible because the articulated bases for his opinions referred too generally to Agent Bevington's knowledge of the investigation or his review of unspecified phone calls or surveillance operations. *See* Appellee's Br. 75-76. In *Hampton*, 718 F.3d at 982-83, Agent Bevington had referred to having "listened to all of the calls . . . [and] done the surveillance" and to his "knowledge of the entire investigation" as the bases for his lay opinion. In *Miller*, 738 F.3d at 373, the FBI agents and detective similarly claimed to have based their lay opinion on their "knowledge of the overall investigation." Neither explanation was held to be sufficient under FRE 701. As the prosecutor and Agent Bevington offered essentially the same objective bases for Agent Bevington's lay opinions here as in *Hampton* and *Miller*, the requirements of FRE 701 were not met.

The lay opinion testimony that Agent Bevington provided in response to questions referencing specific evidence also failed to conform to the requirements of FRE 701. The Government views this testimony as properly admitted under *Hampton* because "[Agent] Bevington stated that [his] opinions were based on specific calls and/or surveillance operations conducted on precise dates." Appellee's Br. 75. In fact, Agent Bevington stated no such thing. Instead, when asked whether he had an opinion regarding the meaning of certain conversations and interactions based on his review of the specified evidence, Agent Bevington stated his

interpretation. Nowhere did Agent Bevington establish that the evidence referenced in the prosecutor's question was a factual basis for his lay opinion testimony, let alone a complete and accurate statement of the bases on which he relied. Nor could the prosecution's questions alone necessarily establish the bases for Agent Bevington's lay opinion. Because, on this record, only Agent Bevington had personal knowledge of what perceptions and reasoning he relied on in formulating his lay opinion, only he was able to provide the "sufficient factual foundation" necessary "to admit lay opinion evidence rationally based on [his] perception." *Williams*, 212 F.3d at 1309 n.6; *see also Garcia*, 413 F.3d at 211-13 (citing Fed. R. Evid. 602). Hence, FRE 701 requires that "[a] *witness* . . . identif[y] the objective bases for his [or her] opinion," not the attorney directing the examination. *Hampton*, 718 F.3d at 981 (emphasis added) (quoting *Rea*, 958 F.2d at 1216). Otherwise, the prosecutor could present rationalizations for Agent Bevington's lay opinions on which he may not have actually relied, effectively vouching for the bases of his lay opinion, misleading the jury, and defeating the purposes of FRE 701. Even assuming, notwithstanding limitations on the use of leading questions, *see Green v. United States*, 348 F.2d 340, 341-42 (D.C. Cir. 1965), this approach would suffice under FRE 701, the Government points to no instance in which the prosecutor elicited testimony from Agent Bevington that his lay opinion was, in fact, based on the factual foundation stated in the prosecutor's question. Nor can such confirmation be inferred from Agent Bevington's responses in view of his testimony on cross-examination that his opinions were based generally on his observations throughout the investigation. *See* Trial Tr. 65 (Nov. 9, 2012, a.m. session).

The requirement that Agent Bevington adequately disclose the objective bases for his lay opinion stems from the

inter-related requirements of FRE 701. Without knowing what observations and reasoning Agent Bevington relied on in arriving at his lay opinion, it is doubtful the district court could determine that his testimony was "rationally based on [his] perception" as required by FRE 701(a), much less be confident that his testimony would be "helpful" to the jury in "clearly understanding the witness's testimony or to determining a fact in issue" by assisting it in its fact-finding role as required by FRE 701(b). Instead, Agent Bevington's testimony may have been "based upon information not before the jury, including hearsay," thereby potentially "usurp[ing] the jury's function" by presenting the conclusion that should be drawn from facts of which he, but not the jury, was fully aware. *Hampton*, 718 F.3d at 983 (quoting *Grinage*, 390 F.3d at 750-51). Jurors not informed of the bases for Agent Bevington's lay opinion might also have thought that Agent Bevington "had knowledge beyond what was before them . . . defer[ing] to the officer's superior knowledge of the case and past experiences with similar crimes," *id.* at 981-83 (quoting *Grinage*, 390 F.3d at 750), rather than independently reaching their own opinions about the evidence and ultimately about whether the Government had met its burden of proof. These risks would not have been mitigated by admitting into evidence all of the wiretap recordings and other investigatory materials available to Agent Bevington because the jury would still have been unaware of what exact perceptions and reasoning led to his lay opinions. *See id.* at 983 (citing *Grinage*, 390 F.3d at 747-48); *see also id.* at 984-86 (Brown, J., concurring). Here, the Government confirmed that not all of the surveillance videos that Agent Bevington acknowledged he had reviewed as part of his investigation were admitted in evidence, implying that his opinions may have been partly based on information that was not before the jury. When a witness fails to identify for the jury the specific observations and inferences on which he grounds each lay

opinion, there is no way for the jury to independently evaluate the testimony.

Additionally, ignorance of the bases for Agent Bevington's lay opinion testimony blurs the distinction in FRE 701(c) between lay and expert opinion testimony. As the Second Circuit has explained:

> In 2001, Rule 701 was amended to provide that testimony cannot be received as lay opinion if it is based on scientific, technical, or other specialized knowledge. Rather, a lay opinion must be the product of reasoning processes familiar to the average person in everyday life. . . . The purpose of this final foundation requirement is to prevent a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702 and the pre-trial disclosure requirements set forth in [Federal Rule of Criminal Procedure] 16 and [Federal Rule of Civil Procedure] 26. Thus, in considering the third prerequisite for lay opinion testimony, a court must focus on the reasoning process by which a witness reached his proffered opinion. If the opinion rests in any way upon scientific, technical, or other specialized knowledge, its admissibility must be determined by reference to Rule 702, not Rule 701.

*Garcia*, 413 F.3d at 215-16 (internal citations, footnote, and quotation marks omitted). Allowing opinion testimony without knowing whether Agent Bevington's opinion testimony was based to some extent on scientific, technical, or specialized knowledge would leave the district court unable to determine whether the reliability and disclosure requirements

of FRE 702 applied.  As a result, there was a risk that Agent Bevington's opinion testimony may have provided expert opinion on "a mental state or condition that constitutes an element of the crime charged" contrary to FRE 704(b).

Furthermore, the Government's use of Agent Bevington as a "two-hatted" witness providing closely related lay and expert opinion testimony exacerbated these risks.  Although the district court instructed the jury on the use of expert testimony and required the prosecutor to signal in questioning when Agent Bevington's expert opinion was being sought, the manner in which Agent Bevington's expert and lay opinions were interspersed during the trial required mental gymnastics of the jurors in determining when he was testifying as an expert and when he was not, risking confusion, particularly absent an adequate explanation of the bases for his lay opinions to distinguish them from his expert opinions.  This "two-hatted" circumstance is mentioned by Appellants only in a footnote, *see* Appellants' Br. 98 n.315, and on appeal they do not challenge the jury instructions in this regard, much less indicate that they sought an instruction to assist the jury in distinguishing when Agent Bevington was not testifying as an expert.  *See United States v. Rhodes*, 62 F.3d 1449, 1453-54 (D.C. Cir. 1995), *rev'd on other grounds*, 517 U.S. 1164 (1996).  The fact that an instruction was given on Agent Bevington's expert testimony alone could, in these circumstances, have led the jury reasonably to assume that all of his opinion testimony was based upon his expertise and not merely on his own perceptions of events presented to the jury.

For these reasons, we hold that there was a significant risk that Agent Bevington's lay opinion testimony assumed an "aura of special reliability and trustworthiness surrounding expert testimony," which may in turn have prejudiced Williams.  *United States v. Cruz*, 363 F.3d 187, 194 (2d Cir.

2004) (quoting *United States v. Dukagjini*, 326 F.3d 45, 53 (2d Cir. 2002)).

## C.

The question remains whether the error in admitting Agent Bevington's lay opinion testimony was prejudicial. Appellants maintain that the error was prejudicial. This depends on whether, "after examining the record as a whole," the court concludes that "[the] error may have had 'substantial influence' on the outcome of the proceeding." *Bank of Nova Scotia*, 487 U.S. at 256 (quoting *Kotteakos*, 328 U.S. at 765). That is:

> [I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*Kotteakos*, 328 U.S. at 765. In other words, the "harmless error test . . . is not a mere sufficiency-of-the-evidence inquiry," but requires reversal if the properly admitted evidence is "even slightly ambiguous" and there is any risk that the error might not be harmless. *Smart*, 98 F.3d at 1391-92.

The Government points to the "overwhelming evidence of Williams's and Bowman's guilt" as indicating that Agent Bevington's lay opinions were likely unnecessary, an observation that the district court also made during trial.

Appellee's Br. 79. But unlike the overwhelming physical and testimonial evidence supporting the convictions of Bowman and Edwards, eliminating any suggestion their convictions must be reversed, the evidence against Williams was of a far lesser order. Agent Bevington conceded on cross-examination that there was no direct evidence before the jury that Williams possessed or sold cocaine to third parties or interacted with co-conspirators other than Bowman. No witness testified to having bought cocaine from Williams; no surveillance video showed him handling anything that any witness identified as cocaine; no audio tape disclosed him discussing cocaine, or anything that any witness other than Agent Bevington identified as cocaine; no one testified to stopping or arresting Williams and finding cocaine in his car, his home, or otherwise in his possession. *See* Trial Tr. 66-72 (Nov. 9, 2012, a.m. session).

The prosecutor's closing argument focused instead on the interactions between Williams and Bowman as showing "the same exact pattern" as Bowman's interactions with others to whom he was selling cocaine, and told the jurors to "[a]sk [them]selves" whether "it makes any sense that people would speak on the phone in the manner that William Bowman and Henry Williams did" if they were not "discussing drug trafficking." Trial Tr. 49-50 (Nov. 15, 2012, a.m. session). In other words, in the absence of direct evidence of Williams's guilt, the prosecutor relied on the inferences jurors were willing to draw from Williams's interactions with Bowman, as reflected in the wiretap and surveillance recordings the jury had viewed at trial. This is the exact subject addressed by Agent Bevington's erroneously admitted lay opinion testimony, which told the jury to interpret the circumstantial evidence as showing that Williams was buying cocaine from Bowman in amounts that indicated his intent to sell drugs to third parties. Agent Bevington told the jurors not only what

he thought, but his opinion of what the evidence showed and that he had substantial experience in drug conspiracy investigations and was involved in the FBI investigation that resulted in Appellants' indictments.  As in *Hampton*, 718 F.3d at 984, there was a strong "likelihood that the jurors afforded [Agent] Bevington substantial authority because of his expertise and access to information unavailable to them," allowing his lay opinion testimony to influence their decision. Indeed, the district court observed that "the jury's determination as to whether or not . . . Williams was a member of the conspiracy may turn on whether the jury chooses to credit lay opinions expressed by FBI Special Agent Bevington, or reach their own conclusions as to the nature of certain phone calls between Defendants Bowman and Williams."  Order at 4, *United States v. Edwards*, 11-cr-129 (D.D.C. Nov. 12, 2012), ECF No. 561.

Under the circumstances, the court cannot "say, with fair assurance, . . . that the judgment [as to Williams] was not substantially swayed by the error" as to render it harmless, *Kotteakos*, 328 U.S. at 765, and his conviction for conspiring to distribute and possess less than 500 grams of cocaine must be reversed.

## D.

The question remains whether Williams can be retried. Appellants contend that the district court erred in denying his motion for a judgment of acquittal because of the insufficiency of the evidence against him.  If that is correct, then he is entitled to a judgment of acquittal and his retrial would be barred under the Double Jeopardy Clause of the Fifth Amendment.  *See Burks v. United States*, 437 U.S. 1, 13-17 (1978).  Appellants are not correct, however.

Viewing the evidence in the light most favorable to the Government, as the court must, "[a] rational trier of fact could have found the essential elements of [Williams's] crime beyond a reasonable doubt" based on the properly admitted evidence. *United States v. Dykes*, 406 F.3d 717, 721 (D.C. Cir. 2005) (quoting *United States v. Arrington*, 309 F.3d 40, 48 (D.C. Cir. 2002) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979))). The court recently declined to decide whether, in evaluating a claim for insufficient evidence, a court should consider all the evidence before the jury or only that evidence not erroneously admitted, *see United States v. McGill*, 815 F.3d 846, 927-28 (D.C. Cir. 2016) (distinguishing *Lockhart v. Nelson*, 488 U.S. 33, 39-42 (1988)), and because it makes no difference to the conclusion here, we assume without deciding that the more demanding standard applies and do not consider Agent Bevington's erroneously admitted lay opinion testimony.

To prove the essential elements of a narcotics conspiracy under 21 U.S.C. § 846, the Government had to show that Williams "knowingly entered into the . . . conspiracy with the specific intent to further its objective of distributing narcotics." *United States v. Gaskins*, 690 F.3d 569, 577 (D.C. Cir. 2012). Such an agreement can be inferred from circumstantial evidence. *See United States v. Gatling*, 96 F.3d 1511, 1518 (D.C. Cir. 1996). Even without Agent Bevington's lay opinion testimony, there was sufficient evidence to show Williams's knowing involvement in the charged conspiracy. The evidence shows that Bowman and Edwards received a shipment of cocaine on or about March 10, 2011. As confirmed by wiretap recordings, surveillance videos, and testimony of cooperating witnesses, Bowman shortly thereafter began to make arrangements to sell cocaine to individuals who met him in the vicinity of the "Shrimp Boat" restaurant and a nearby condominium. Bowman

continued to make cocaine sales at these and other locations for several weeks.

Bowman's interactions with Williams paralleled Bowman's interactions with other alleged co-conspirators. At trial, wiretap recordings of their phone conversations in January and February 2011 showed that Williams repeatedly checked with Bowman regarding the status of some unspecified event, which Bowman generally indicated had not yet happened. On March 12, 2011, however, Bowman phoned Williams to tell him that he could "holler at [Bowman] in a little bit" near the Shrimp Boat restaurant, but warned Williams that he had a "couple of other people coming to see [him]" and "d[id]n't want . . . everybody to come at the same time." Gov't Ex. 3056A. Bowman and Williams were videotaped meeting that evening outside the Shrimp Boat restaurant sitting in Williams's car.

Bowman and Williams spoke again the morning of March 15, 2011, and arranged to meet again later that day. Security footage at a public storage facility where Bowman and Edwards stored and processed cocaine for distribution showed Bowman visiting the facility shortly before his meeting with Williams. Bowman and Williams were later videotaped meeting outside the Shrimp Boat restaurant.

Williams called Bowman again on March 20, 2011, and asked if Bowman was "still . . . alright with man" and whether "two [was] possible," saying: "I got one that gonna go as soon as I get it from you, is gonna go, and then I'm gonna get the one for me." Gov't Ex. 3096A. Bowman said it was possible. In a wiretapped phone conversation the next day on March 21, 2011, Bowman phoned Moorer, a confessed co-conspirator of Bowman and Edwards, and told him: "You know what I just told you? . . . Just add . . . to that one."

Gov't Ex. 3129A. Moorer testified as a cooperating witness at trial that this was Bowman requesting that Moorer bring him more cocaine. A videotape showed Bowman meeting with Moorer on March 21, 2011, when Moorer provided Bowman with what Moorer testified were three sixty-two-gram quantities of cocaine. As Moorer testified at trial: "When I met [Bowman], he told me . . . two guys wanted [cocaine]. I guess one of them wanted more." Trial Tr. 35 (Nov. 2, 2012, p.m. session). In two wiretapped phone conversations on March 22, 2011, Williams asked Bowman questions to the effect of: "[B]efore I get rid of this joint . . . [y]ou . . . good for tomorrow? You got it?" Gov't Ex. 3107A; *see also* Gov't Ex. 3106A. Bowman replied he did. The next day, March 23, 2011, a surveillance video showed Bowman and Williams meeting once again in Williams's car outside the Shrimp Boat restaurant.

A reasonable juror could infer from this evidence and evidence regarding Bowman's sales to other alleged co-conspirators that Bowman and Williams were engaged in cocaine trafficking. Unlike in *Gaskins*, 690 F.3d at 574, on which Appellants rely, this is not a case in which there was "no evidence that [Williams] participated in any drug transactions or conspiratorial meetings . . . [or] was ever present at or near the" site of the conspiracy's activities. Instead, a juror could reasonably find that Bowman was selling cocaine to Williams based on the timing, nature, and locations of Bowman's interactions with Williams. From the frequency with which he received quantities of cocaine from Bowman, as well as his March 20 statement ("I got one that gonna go as soon as I get it from you . . . and then I'm gonna get the one for me," Gov't Ex. 3096A), a reasonable juror could also find that Williams intended to distribute cocaine to third parties. And a reasonable juror could find that Bowman and Williams's frequent discussion of others who were

involved in similar activities with Bowman showed that Williams had the requisite knowledge of the conspiracy. That there may be alternative interpretations of the evidence is not relevant because the court must presume that the jury resolved any conflicting inferences supported by the record in the Government's favor. *See Jackson*, 443 U.S. at 326. Accordingly, we hold that the district court did not err in denying Williams's motion for a judgment of acquittal.

## IV. Wired Plea Agreement

Bowman argues that the Government violated his Fifth Amendment due process rights by offering him a "wired" plea deal that was contingent on Williams pleading guilty to the charged drug conspiracy. According to Bowman, the Government knew that a jury would only convict Williams if he was associated with the more culpable Bowman and so wired Bowman's plea in a bad-faith attempt to ensure the two were tried together.

As a threshold matter, the parties disagree over the applicable standard of review. Bowman contends that his due process claim is subject to *de novo* review. *Cf. United States v. Straker*, 800 F.3d 570, 629 (D.C. Cir. 2015). The Government, by contrast, argues that plain error review applies because Bowman did not raise his constitutional challenge before the district court. *See United States v. Mahdi*, 598 F.3d 883, 888 (D.C. Cir. 2010). We need not resolve that disagreement because Bowman's due process argument fails under either standard. The parties also dispute whether the Government offered Bowman an opportunity to accept an "unwired" plea deal conditioned only on his own cooperation with the Government, rather than on Williams also pleading guilty. That preliminary factual dispute is

immaterial because, as we explain below, the Government's "wired" plea agreement was constitutionally permissible.

Bowman's due process challenge fails under *United States v. Pollard*, 959 F.2d 1011 (D.C. Cir. 1992). There, the Government conditioned any plea agreement for the defendant's ailing wife on the defendant also pleading guilty. *See id.* at 1015, 1020. The defendant accepted that wired plea deal but claimed that it violated his due process rights by effectively coercing him into pleading guilty to secure a plea deal for his wife. *See id.* at 1020 (citing *Fontaine v. United States*, 411 U.S. 213, 214-15 (1973)). The court concluded that the defendant's due process argument was meritless and joined its sister circuits in holding that plea wiring "does not, *per se*, offend due process." *Id.* The court explained that the wired plea accepted by the defendant was constitutional because the Government "had probable cause to arrest and prosecute both defendants in a related crime, and there [wa]s no suggestion that the government conducted itself in bad faith in an effort to generate additional leverage over the defendant." *Id.* at 1021.

There is even less concern on this record than in *Pollard* that Bowman was somehow coerced by the Government's decision to offer him a plea deal contingent on a co-defendant's guilty plea. There is no argument here that the Government induced Bowman to plead guilty by promising a shorter sentence for any loved one or spouse. *Cf. id.* ("We can understand how it might be thought that a threat of long imprisonment for a loved one, particularly a spouse, would constitute even greater pressure on a defendant than a direct threat to him."). Nothing in the record suggests that the Government wired Bowman's plea in a bad-faith effort to coerce him into involuntarily accepting a plea or to convict Williams based on guilt by association. Rather, the

Government offered Bowman the opportunity to plead guilty to a lower sentence if his alleged co-conspirator, Williams, also pleaded guilty. A plea offer that reflects the Government's apparent preference either to accept guilty pleas from both defendants or, if it must try Williams, to try Bowman as well provides no basis to conclude that the Government's offer was coercive or made in bad faith. Bowman nevertheless urges us to infer the Government's bad faith from the fact that Williams played a much more minor role in the charged conspiracy. But we decline the invitation to assign nefarious intent to the Government's conduct based on Bowman's speculation. Bowman also contends that the wired plea was itself evidence of the Government's intent to force Williams and Bowman into a joint trial. The district court had denied Williams's request to sever his trial from that of his co-defendants, thereby authorizing the Government to proceed against both defendants in the same trial. The record belies Bowman's assertion that the wired plea was an unconstitutionally coercive ploy to try Williams and Bowman together.

Additionally, the Government had probable cause to arrest and prosecute both Bowman and Williams for their participation in the charged drug trafficking conspiracy. As in *Pollard*, there is no plausible basis for Bowman's suggestion that the Government resorted to "bad faith in an effort to generate additional leverage" over Bowman and Williams. *Id.* In light of the evidence and information gathered from wiretaps, physical surveillance, and confidential sources, *see supra* Parts I & III.D, the arresting agents reasonably concluded that Bowman and Williams each participated in the suspected cocaine distribution conspiracy. *See generally United States v. Holder*, 990 F.2d 1327, 1328 (D.C. Cir. 1993) ("Probable cause exists if a reasonable and prudent police officer would conclude from the totality of the

circumstances that a crime has been or is being committed."). It is undisputed that the Government obtained a valid indictment charging both Bowman and Williams with conspiring to distribute cocaine, which "conclusively determines the existence of probable cause" in their criminal case. *Gerstein v. Pugh*, 420 U.S. 103, 117 n.19 (1975). Because the Government "had probable cause to [arrest and] prosecute" Bowman and Williams and "obtained a valid indictment" against them, "it was entitled . . . to prosecute [Appellants] fully" or "to offer lenience." *Pollard*, 959 F.2d at 1021. Bowman might have preferred an offer of lenience in the form of an unwired plea agreement, but he had "no right to be offered a plea" at all, *Missouri v. Frye*, 132 S. Ct. 1399, 1410 (2012), much less the particular plea agreement of his choosing. Accordingly, the Government's plea offer did not violate Bowman's due process rights.

## V. Acquitted Conduct in Sentencing

Edwards argues that the district court violated his Fifth and Sixth Amendment rights by increasing his sentence based on his possession of a firearm, even though the jury had acquitted him of that same conduct. Controlling precedent squarely forecloses that argument, as Edwards correctly acknowledges. In *United States v. Bell*, 795 F.3d 88 (D.C. Cir. 2015), this court stated that "long-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proved by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction or increase the statutory mandatory minimum." *Id.* at 103 (internal quotation marks omitted); *see United States v. Jones*, 744 F.3d 1362, 1369 (D.C. Cir. 2014); *United States v. Settles*, 530 F.3d 920, 923-24 (D.C. Cir.

54

54

2008). Because *Bell* is binding on this panel – and notwithstanding the serious concerns that some have raised, *see United States v. Bell*, 808 F.3d 926, 928-32 (D.C. Cir. 2015) (Millett, J., concurring in denial of rehearing en banc); *id.* at 927-28 (Kavanaugh, J., same) – we must reject Edwards's constitutional challenge and affirm his sentence. *See LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc).

## Conclusion

For the foregoing reasons, we affirm the judgments of the district court with respect to each Appellant, with the exception of Williams. Because the district court's admission of Agent Bevington's lay opinion testimony was error under FRE 701 and that error was not harmless, we reverse Williams's conviction and remand the case to the district court for further proceedings. We therefore need not reach the question whether the district court erred by refusing to provide the jury with a multiple conspiracies instruction, issue limiting instructions concerning specific evidence submitted against Edwards and Bowman, or sever Williams's trial from that of Edwards and Bowman.

*So ordered.*